Dominic Cosentino et al., Appellants, v. City of Omaha, a Municipal Corporation, et al., Appellees.

183 N. W. 2d 475

Filed February 5, 1971.  No. 37623.

Guinan & Kolenda and Foulks, Wall & Wintroub, for appellants.

D. C. Bradford of Monsky, Grodinsky, Cohen, Garfinkle & Zweiback, Robert J. Kutak of Kutak, Rock, Campbell & Peters, Herbert M. Fitle, and Peter J. Vaughn of Fraser, Stryker, Marshall & Veach, for appellees.

Heard before White, C. J., Carter, Spencer, Boslaugh, Smith, McCown, and Newton, JJ.

Smith, J.

Plaintiffs taxpayers attacked agreements concerning

treatment of packinghouse waste in a facility financed by bonds of a private nonprofit corporation. Income to pay the bonds was to be received from the City of Omaha as lessee under a lease-purchase agreement. After trial the district court dismissed plaintiffs' petition. Plaintiffs appeal. They contend that the city (1) granted an invalid franchise, (2) unconstitutionally lent its credit to a private corporation, and (3) failed to comply with statutory requirements relating to competitive bidding.

## BACKGROUND

Packinghouses and other industries in Omaha historically discharged raw waste through city sewers into the Missouri River. The method, everyone once thought, was efficient, economical, and beneficial to all.

In 1957 federal authorities cited Omaha for permitting uncontrolled discharge of raw domestic and industrial wastes through city sewers into the river. They held hearings in 1957, 1964, 1966, and 1967. Omaha constructed interceptor sewer systems and the Missouri River Sewage Treatment Plant. The south half of the plant, designed to treat packinghouse and other wastes, was inoperable because it could not process paunch manure.

Paunch manure is the solid materials retained in the first stomach of cattle and sheep. From the Omaha sewers it came mixed with street washings, storm drainage, and other industrial, animal, and human wastes. Engineers in 1964 reported: ". . . paunch manure . . . is a mean and nasty material . . . . Nowhere are successful processes in operation for disposing of this material in urban areas except . . . land fill. . . ." The city rejected the landfill method because of insufficient land and high moisture content of paunch manure. Solution of the problem would be clearly pioneer.

Some in-plant method of substantial treatment of paunch manure had been recommended. Such treatment at a central facility prior to mixture with other wastes in interceptor sewers won approval in 1964 for several reasons. First, packinghouse capital was inade-

quate. Second, central treatment represented overall economy. Third, it obviated important objections to in-plant methods: Difficulties of (1) the city monitoring in-plant units and (2) one malfunctioning in-plant unit forcing a shutdown and bypass of the south half of the Missouri River Sewage Treatment Plant.

The city authorities decided to use a new process patented by Charles Greenfield. He intended not only to process paunch manure satisfactorily but also to recover animal fat which would become marketable animal feed. He testified that this phase of recycling would be profitable. His process was operating on a small scale at several places. Essential variables of the process were within his proprietary knowledge so that its successful operation would require application of that knowledge.

Defendant Carver-Greenfield Corporation held exclusive rights to license patents on the process. It organized a wholly owned subsidiary, defendant Carver-Greenfield Omaha, Inc. Defendant Omaha Pollution Control Corporation was organized as a Nebraska private nonprofit corporation. Its articles of incorporation were not amendable to the extent that they stated a corporate purpose to give the treatment facility to the city after payment of indebtedness.

## THE AGREEMENTS

The agreements were made in September 1967. Carver-Greenfield granted Carver-Greenfield Omaha and Pollution Control a royalty free license to process packinghouse wastes through the project. Carver-Greenfield Omaha was to pay royalties on sales of recovered materials, but Carver-Greenfield agreed to subordinate royalties to operational fees and expenses.

The city agreed upon operation of the facility by Carver-Greenfield Omaha for a semiannual fee of $50,000 payable out of revenue from the operation. The term was 10 years renewable for 10 years at the option of the city.

Under the lease-purchase agreement Pollution Control

was to purchase land and construct the facility by issuance and sale of its bonds in the principal sum of $5,500,-000. Expenditures were subject to reasonable approval of the city. The city agreed to construct the collecting sewers. Its electors in May 1966 had approved issuance of general obligation bonds in the sum of $1,200,000 for that purpose. The city also agreed to (1) pay premium charges on casualty and liability insurance policies and taxes, (2) operate and maintain the project for a term of 30 years, and (3) pay a basic net rent of $180,000 semiannually commencing the 29th month after sale of the city bonds. Rent and miscellaneous sums were payable by the city to Pollution Control as long as the latter's bonded indebtedness and related items were unpaid. The city had an option to purchase the facility at any time for a price equal to the total of unpaid installments of rent, bond interest, and trust indenture premium. Otherwise, the agreement contemplated transfer of title, subject to rights of Pollution Control, to the facility at the expiration of 30 years to the city.

In the bond indenture Pollution Control covenanted that the lease was valid. It pledged its interest in the lease-purchase agreement, a policy of title insurance, and income from the facility to the trustee for the bondholders. The indenture provided, in event of default, for acceleration of principal and interest and for any action deemed desirable by the trustee to produce revenue.

Packinghouses promised the city to contribute to payment of Pollution Control bonds. The amount was $0.07 to $0.10 a head of beef killed at their Omaha plants each year, the amount varying with salable grease to be obtained during the year. Based on the slaughter rate in 1965, the amount of this annual payment was estimated at $148,000. Municipal surcharges would be removed, but payment of sewer use fees common to all sewer users would be continued.

The city took bids on the sewer construction contracts

financed with proceeds of the sale of its general obliga-
tion bonds, but no other competitive bidding occurred in
connection with the project.

Pollution Control owned the land upon which Carver-
Greenfield was constructing the plant at the time of
trial in May 1969. The claim of Greenfield's patents
read on the processes or apparatuses included in design
of the plant. Pollution Control has paid consolidated real
estate taxes to the treasurer of Douglas County. Internal
Revenue Service had ruled that interest on Pollution
Control bonds would be excludable from gross income
under section 103(a) (1) of the Internal Revenue Act
of 1954. It considered the bonds an issue on behalf of the
city.

## THE FRANCHISE ISSUE

Plaintiffs contend that the lease-purchase agreement
was a franchise that violated section 14-811, R. R. S.
1943, which required electoral approval of franchises
in Omaha, a metropolitan city. The force of the con-
tention depends upon other statutory sections.

Section 14-365.05, R. R. S. 1943, reads: "For the pur-
pose of providing for such sewage disposal plant . . .
(a metropoliton city) may also enter into a contract with
any corporation . . . to construct and provide the facilities
and services as hereinbefore described . . .." Enacted
in 1953, the section bears the head "Franchises" supplied
in compilation. The head does not affect our interpreta-
tion of the text. Section 49-802, R. R. S. 1943, enacted
in 1947, reads: "Unless such construction would be in-
consistent with the manifest intent of the Legislature,
rules for construction of the statutes . . .hereafter en-
acted shall be as follows: . . . (8) . . . section . . . heads
. . . in the statutes . . ., supplied in compilation, do not
constitute any part of the law."

Nothing in the text of sections 14-365.01 to 14-365.13,
R. R. S. 1943, subjected the lease-purchase agreement
to the franchise requirements of section 14-811, R. R. S.
1943. Indeed, section 14-365.13, R. R. S. 1943, with ex-

ceptions immaterial here, provided: ". . . sections 14-365.01 to 14-365.13 shall be independent of and in addition to any other provisions of the laws of the state . . . with reference to sewage disposal plants . . . in metropolitan cities. . . . sections 14-365.01 to 14-365.13 shall not be considered amendatory of or limited by any other provision of the laws of the State . . .."

In order to decide upon the modus operandi of city authority in the transaction, we look at a number of statutory sections. Section 14-365.01, R. R. S. 1943, authorized the city in regard to a disposal plant to make an annual special levy not to exceed one mill on the dollar upon the assessed value of all taxable tangible property within the city. Section 14-365.02, R. R. S. 1943, authorized the city to issue mortgage bonds that imposed no general liability upon the city. No procedure was specified.

Section 14-365.03, R. R. S. 1943, authorized the governing body of the city to make (1) all necessary rules and regulations governing the use, operation, and control of the plant and (2) equitable charges which might take the form of special assessments.

Section 14-365.07, R. R. S. 1943, authorized the city to issue revenue bonds by ordinance passed by the mayor and city council "without any other authority." The section also authorized general obligation bonds, but the city could not issue them without approval of the electors. Section 14-365.05, R. R. S. 1943, which authorized the city to contract with any corporation to construct and provide a waste facility, did not specify any procedure.

The Legislature in 1953 doubtless had in mind the spirit of the Water Pollution Control Act of 1948. Act of Congress, June 30, 1948, c. 758, 62 Stat. 1155. The act generally imposed primary responsibility upon the states for degradation of water quality. It authorized administrative enforcement through judicial orders for abatement. The Legislature has not amended section 14-365.05, R. R. S. 1943, while federal insistence on state compliance

with standards of water quality has grown. See Barry, "The Evolution of the Enforcement Provisions of the Federal Water Pollution Control Act: A Study of the Difficulty in Developing Effective Legislation." 68 Mich. L. Rev. 1103 (1970).

The parties stipulated: "14. That the Mayor of the City of Omaha and the City Clerk were authorized to execute and attest respectively the lease-purchase agreement . . . by Ordinance . . . duly adopted pursuant to regular Charter procedures on August 22, 1967." We conclude that the lease-purchase agreement was not an invalid franchise.

LOAN OF CREDIT TO A PRIVATE CORPORATION

The Constitution of Nebraska, Article XIII, section 3, prohibits the state and political subdivisions from lending credit to a private corporation. A city directing credit to a public purpose with incidental benefit to a private corporation does not violate the constitutional prohibition against the state and its subdivisions lending credit to a private corporation. See, State ex rel. Beck v. City of York, 164 Neb. 223, 82 N. W. 2d 269 (1957); cf. State ex rel. Johnson v. Consumers Public Power Dist., 143 Neb. 753 at 766, 767, 10 N. W. 2d 784 at 794, 152 A. L. R. 480 (1943). In the present case there was no violation.

ABSENCE OF COMPETITIVE BIDDING

Three agreements, engineering and construction, operating, and lease-purchase, were made without competitive bidding. Section 14-365.08, R. R. S. 1943, required a metropolitan city to advertise for sealed bids and to let a contract for construction of a sewage disposal plant to the lowest responsible bidder.

Requirements for competitive bidding are strictly construed against public authorities. Cullingham v. City of Omaha, 143 Neb. 744, 10 N. W. 2d 615 (1943). In Wurdeman v. City of Columbus, 100 Neb. 134, 158 N. W. 924 (1916), we upheld a contract awarded to the lowest bidder on specifications including patented material.

414

The patentee, however, had offered to supply the material at the same price to all bidders.

We decline to rule flatly that competitive bidding requirements literally control every situation. Should we do so, we would compel governing authorities at times to act against the public interest. Where a process or article is patented, public authorities may specify its use without complying with competitive bidding requirements in these circumstances: The process or article in their judgment possesses such exceptional superiority that it would be a public injury for the authorities not to use it. See, Wegmann Realty Co. v. City of St. Louis, 329 Mo. 972 at 985, 986, 47 S. W. 2d 770 at 775, 776 (1932); Smith v. City of Seattle, 192 Wash. 64, 72 P. 2d 588 (1937); 10 McQuillin (3d Ed.), Municipal Corporations, § 29.42, pp. 348 to 353 (1966). Similarly, a contract with an operator of a facility may be let without competitive bidding where highly specialized technical skills possessed only by him are required to operate the facility. See Potts v. City of Utica, 86 F. 2d 616 (2d Cir., 1936).

Plaintiffs state that the venture has turned out badly, but the evidence supported the practicability of the Greenfield process, particularly in respect to the quality of the effluent from the Greenfield process. In the particular circumstances, the agreements were not subject to competitive bidding requirements.

Other contentions of plaintiffs are not well taken. The judgment is affirmed.

AFFIRMED.