420 A.2d 443

Joe BELL, by his guardian and father, Timothy Bell; Vicki Boyer, by her guardian and sister, Romaine Ren; Leo Gerletski, by his guardian and brother, Frank Gerletski; Sharon Khourr, by her guardian and mother, Helen Boyer; Sam Kanyuck, by his guardian and brother, Albert Kanyuck; Marie LaRosa, by her guardian and husband, Michael LaRosa; Ida Lisnov, by her guardian and daughter, Florence Weiner; James Moran, by his guardians and parents, Mr. and Mrs. James Moran; Irene Nice, by her guardian and daughter, Catherine; Beverly Smith, by her guardian and husband, Charles Smith; Alex Weron, by his guardian and sister, Helen Lee; William Wunch, by his guardian and mother, Mildred Wunch; patients at Retreat State Hospital on behalf of themselves and all others similarly situated, and Frank Crossin, County Commissioner of Luzerne County, Pennsylvania and John McDonald, Trustee of Retreat State Hospital, and Francis J. O'Connel, Senator, 20th Senatorial District, Commonwealth of Pennsylvania, and Bernard O'Brien, Representative, 121st District, Commonwealth of Pennsylvania, and Ronald Gatski, Representative, 116th District, Commonwealth of Pennsylvania and Fred J. Shupnik, Representative, 119th District, Commonwealth of Pennsylvania, and Raphael Musto, Representative, 118th District, Commonwealth of Pennsylvania and George Hasay, Representative, 117th District, Commonwealth of Pennsylvania, and Franklin Coslett, Representative, 120th District, Commonwealth of Pennsylvania, and Council 13, American Federation of State, County & Municipal Employees, AFL–CIO, by its Trustee Ad Litem, Gerald W. McEntee, Appellees,

v.

Honorable Richard THORNBURGH, Governor of the Commonwealth of Pennsylvania, Commonwealth of Pennsylvania: Department of Public Welfare: Helen O'Bannon, Secretary of Public Welfare, Commonwealth of Pennsylvania; John Cuddy, Executive Deputy Secretary, Department of Public Welfare, Commonwealth of Pennsylvania; Kathryn McKenna, Regional Secretary, Department of Public Welfare, Commonwealth of Pennsylvania; Department of General Services; Walter Baran, Secretary of the Department of General Services, Appellants.

Supreme Court of Pennsylvania.

Sept. 22, 1980.

Jonathan Vipond, III, Philadelphia, for appellants.

Richard Kirschner, Philadelphia, for appellees.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, LARSEN, FLAHERTY and KAUFFMAN, JJ.

### OPINION OF THE COURT

LARSEN, Justice.

This is an appeal from a preliminary injunction issued by the President Judge of the Commonwealth Court (sitting as a Chancellor in equity) which, among other things,[1] prohibited the Commonwealth from proceeding with its plans to close Retreat State Hospital ("Retreat") and prohibited the transfer of Retreat's patients to other state facilities. For the reasons stated below, we reverse that order and dissolve the injunction.

Appellants are the Governor, the Commonwealth, the Department of General Services and the Secretary of that Department, the Department of Public Welfare (DPW) and the Secretary of that Department, and a number of subordinate officials in DPW. In March of 1980, DPW Secretary Helen O'Bannon announced appellants' decision to close Retreat, a state–owned and operated mental health facility in Luzerne County providing inpatient services to mentally ill residents, and disclosed a plan for transferring the residents to other state mental health facilities.[2]

1. The text of the final eight–page order, which was issued on May 19, 1980, is attached hereto as Appendix A. To date, no findings of fact have been made, nor has a written opinion been filed.

2. The decision to close Retreat was predicated on a number of factors, including: "the need for continuing renovations in the physical plant to bring [Retreat] into compliance with the Life Safety Code; the need to hire additional staff in order to obtain Medicare certification; the high operating costs at Retreat, which are substan-

Appellants' decision predictably proved unpopular with appellees--the employees of Retreat (Council 13 of the American Federation of State, County and Municipal Employees), a Luzerne County Commissioner, a member of Retreat's Board of Trustees, seven members of the Pennsylvania General Assembly from Luzerne County, and twelve persons who are guardians of residents at Retreat. Appellees presented a Motion for a Preliminary Injunction to the Chancellor seeking to enjoin the closing of Retreat, which motion was granted following hearings and argument. The Chancellor issued an order on April 14, 1980 preliminarily enjoining appellants from transferring mentally disabled patients at Retreat to other mental health facilities without the express consent of the patient or his or her guardian and enjoining appellants from reducing the staff or level of operations at Retreat. Subsequent modifications of that order substantially restricted the appellants and their agents from attempting to solicit the consent of the patients. This expedited appeal followed.

Our standard of review of preliminary injunctions is well settled.

As a preliminary consideration, we recognize that on an appeal from the grant or denial of a preliminary injunction, we do not inquire into the merits of the controversy, but only examine the record to determine if there were any apparently reasonable grounds for the action of the court below. Only if it is plain that no grounds exist to support the decree *or that the rule of law relied upon was palpably erroneous or misapplied* will we interfere with the decision of the Chancellor. *Intraworld Inc. v. Girard Trust Bank*, 461 Pa. 343, 336 A.2d 316 (1975); *Credit Alliance Corp. v. Philadelphia Minit–Man Car Wash Corp.*, 450 Pa. 367, 301 A.2d 816 (1973); *Zebra v. Pittsburgh School District*, 449 Pa. 432, 296 A.2d 748 (1972). "In order to sustain a preliminary injunction, *the plaintiff's*

tially higher than those of comparable facilities; and the existence of two other facilities (Clarks Summit State Hospital and Danville State Hospital) within 50 miles of Retreat, both of which were already Medicare–certified." Brief for Appellants at 19.

*right to relief must be clear, the need for relief must be immediate, and the injury must be irreparable if the injunction is not granted.*" *Zebra v. Pittsburgh School District,* 449 Pa. at 437, 296 A.2d at 750. (emphasis added). *Roberts v. School District of Scranton,* 462 Pa. 464, 469, 341 A.2d 475, 478 (1975). (emphasis added) In the instant case, the appellees' right to relief was far from clear—in fact, there was *no* right to relief. Therefore, the preliminary injunction must be vacated.

Appellees premised their Motion for Preliminary Injunction on two contentions:

"[I] The proposed transfer of Retreat patients to other state facilities violates Section 207 of the Mental Health Procedures Act, Act of July 9, 1976, P.L. 817, No. 143, *as amended,* 50 P.S. § 7207 . . . which states that patients who are voluntarily committed to state hospitals may not be transferred without their consent.

[II] The transfer of patients without their consent will subject them to "transfer trauma," a recognized syndrome which will cause substantial physical and psychological damage to those transferred. Transfer trauma will, in all likelihood, have lethal consequences for a number of patients. The transferring of Retreat patients thus violates Article I, Section 1 of the Pennsylvania Constitution, in that it denies to the patients the right to enjoy life and liberty; and the Fifth Amendment of the United States Constitution, in that it denies patients life, liberty and property interests without due process of law." Brief for Appellees at 2–3.

## Contention I
### *Alleged Violation of Section 207 of the Mental Health Procedures Act*

This section provides "A person who is in voluntary treatment may not be transferred from one facility to another without his written consent." 50 P.S. § 7207 (supp.1979–80). The section is silent with regards to the situation where transfer is required due to the closing of a particular facili-

ty, and its application to such a situation is, therefore, a matter to be resolved by statutory interpretation.

Since almost all of Retreat's residents are voluntarily committed patients, appellees interpret section 207 as prohibiting the closing of Retreat as, they argue, closing would necessitate transfers without the consent of the patients in derogation of that section. Such an interpretation ignores the purpose of the Act and the intent of the General Assembly, and leads to an unreasonable and unwarranted result.

■ We are guided by several salient provisions of the Statutory Construction Act of 1972, 1 Pa.C.S.A. §§ 1501–1991 (supp. pamphlet 1979–80). First, the object of all statutory interpretation and construction is to ascertain and effectuate the intention of the General Assembly, giving effect, if possible, to all provisions of a statute. Section 1921(a). Section 1921(b) further provides that "[w]hen the words of a statute are *clear and free from all ambiguity*, the letter of it is not to be disregarded under the pretext of pursuing its spirit." (emphasis added). Applied to pending transfers of voluntarily committed patients from a facility in the process of closing, section 207 of the Mental Health Procedures Act (the Act) is certainly not "clear and free from all ambiguity." Thus, we must go beyond section 207 to ascertain and effectuate the intention of the legislature.

Some of the relevant considerations are the occasion and necessity for the statute, the circumstances under which it was enacted, the object to be obtained and the consequences of a particular interpretation. Section 1921(c). Further, section 1922 of the Statutory Construction Act establishes certain presumptions in ascertaining legislative intent, as follows:

> In ascertaining the intention of the General Assembly in the enactment of a statute the following presumptions, among others, may be used:

(1) That the General Assembly *does not intend a result that is absurd, impossible of execution or unreasonable.*

(2) That the General Assembly *intends the entire statute to be effective* and certain.

.    .    .    .    .

(5) That the General Assembly *intends to favor the public interest as against any private interest.* (emphasis added).

■ Applying these principles of statutory construction, and a little common sense, it is apparent the legislature did not intend section 207 of the Act to be used as a bar to the closing of a particular institution. It is the appellants–not the patients–who are statutorily charged with the responsibilities and duties of maintaining the state–wide system of mental health facilities and programs and of "assur[ing] the availability of adequate treatment to persons who are mentally ill." Section 102 of the Act, 50 P.S. § 7102. Appellees' interpretation of section 207 would lead to the unreasonable result that a few patients could, by withholding their consent to transfer, prevent the closing of a particular facility which had been deemed unsafe, uneconomical and unnecessary by those who are charged with the responsibility to make such decisions, and are in fact, in a better position to evaluate and analyze the needs of the entire mental health system.

Section 104, 50 P.S. § 7104 of the Act requires that adequate treatment shall be provided to all persons in treatment who are subject to the Act, and provides that adequate inpatient treatment shall include "such accommodations, diet, heat, light, sanitary facilities, clothing, recreation, education and medical care *as are necessary to maintain decent, safe and healthful living conditions.*" (emphasis added). DPW must assure the availability and equitable provision of adequate mental health and mental retardation services for all persons within the state who need them. Section 201(1) of the Mental Health and Mental Retardation Act of 1966,

50 P.S. § 4201 (1969).[3]   To assure the availability and equitable provision of adequate service, DPW must

> (4) . . . *adopt State—wide plans for the operation of all State operated facilities under the jurisdiction of the department and to assign to each facility or portion thereof, such duties for the care of the mentally disabled, as the secretary shall prescribed.   The assignments herein referred to shall be made with due regard to geographical location and population distribution* [and must]

> (5) . . . establish and maintain working relationships with other governmental bodies and public and private agencies, institutions and organizations *so as to assure maximum utilization of services and facilities which each such governmental body and public and private agency, institution and organization may have, which may be of benefit to the mentally disabled.*   Section 201(4), 201(5), *id.,* 50 P.S. §§ 4201(4), 4201(5).   (emphasis added).

Appellees' interpretation of section 207 is fundamentally at odds with this entire procedure and framework set up by the legislature.   Certainly, section 207 requires that the residents of Retreat (all but one of whom are voluntary commitments) give their consent to transfer to a receiving state facility *if* they wish to continue to receive treatment.[4] If the resident (or his guardian) chooses to withhold consent, he is free to seek alternative treatment elsewhere; however, he may not, by withholding that consent, prohibit appellants from implementing their plans to close Retreat.

An almost identical issue was presented to the Commonwealth Court in *Hoolick v. Retreat State Hospital,* 24 Pa. Cmwlth. 218, 354 A.2d 609 (1976), petition for allowance of appeal denied 476 Pa. 317, 382 A.2d 739 (1978), wherein a patient sought to enjoin the Commonwealth from closing the Retreat facility.   That case was decided before the Mental

3.  The duties and responsibilities of DPW outlined in section 201 of the Mental Health and Mental Retardation Act of 1966 have not been altered by the Mental Health Procedures Act.   *See* 50 P.S. § 7502.

4.  The testimony indicates state officials took it as a "given" that consent—to—transfer forms would be obtained from the transferees.

Health Procedures Act was adopted and, thus, appellees there lacked the "ammunition" of section 207 of that Act. We feel, however, that the principles enunciated in *Hoolick* are as viable now as then, for, as we have noted, section 207 is not the bar that appellees wish it to be. The Commonwealth Court stated in *Hoolick*:

> Contrary to plaintiff's assertion, we can find no duty placed upon the State by this legislation [the Mental Health and Mental Retardation Act of 1966] that Retreat or any particular mental health facility must remain open and functional for any specific or indefinite future period of time.
>
> .     .     .     .     .
>
> The manifest object of the General Assembly in enacting the Mental Health and Mental Retardation Act of 1966 was to create a cooperative State–county (or multi–county) program across the Commonwealth for those who suffer mental health or mental retardation afflictions. *Its implementation and need for flexibility to meet improved or new methods and means of treatment would be seriously impaired if not totally frustrated if Retreat or another particular State mental health facility were to enjoy such a monolithic status. To retard or restrict State action in the operation of such a program, a clear specific legislative intent that a particular mental health facility shall remain functional would be required. The Act contains no such provisions.* Id. at 354 A.2d 611, 612. (emphasis added).

From the above, it is clear the preliminary injunction cannot be sustained on the ground that the proposed transfer violates section 207 of the Act.

### Contention II

#### *Alleged Due Process Violations*

■ Appellees have also asserted constitutional bases for requiring Retreat to remain operational; specifically, appellees raise the protections of life, liberty and property interests embodied in Article I, Section 1 of the Pennsylvania

Constitution and the Fourteenth Amendment of the United States Constitution. The United States Supreme Court has recently decided this issue against appellees. In *O'Bannon v. Town Court Nursing Center,* 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980), that Court reversed the Court of Appeals for the Third Circuit which had sustained a preliminary injunction prohibiting patient transfers from Town Court Nursing Center until they had been granted a hearing. In that case, the patients asserted a constitutionally protected entitlement to continued residency at the nursing home of their choice. The sources claimed as the bases of that entitlement were similar to those claimed by appellees herein; namely, a statutory entitlement (from three Medicaid provisions including one which prohibited transferring patients except for certain specific reasons not applicable therein) and life and liberty interests which they claimed were jeopardized by the trauma that would accompany transfer. The transfers in *Town Court* were necessitated by loss of federal funds because the facility had lost its Medicaid certification. The United States Supreme Court phrased the issue as "whether the patients have an interest in receiving benefits for care in a particular facility that entitles them, as a matter of constitutional law, to a hearing before the Government can decertify that facility." The Court was not persuaded by either asserted justification for the "right" to remain in a particular facility.

As to the Medicaid regulations argument, that Court stated:

Whether viewed singly or in combination, the Medicaid provisions relied upon by the Court of Appeals do not confer a right to continued residence in the home of one's choice. 42 U.S.C. § 1396a(a)(23) gives recipients the right to choose among a range of *qualified* providers, without government interference. By implication, it also confers an absolute right to be free from government interference with the choice to remain in a home that continues to be qualified. *But it clearly does not confer a right on a recipient to enter an unqualified home and demand a*

*hearing to certify it, nor does it confer a right on a recipient to continue to receive benefits for care in a home that has been decertified.* Second, although the regulations do protect patients by limiting the circumstances under which a *home* may transfer or discharge a Medicaid recipient, *they do not purport to limit the Government's right to make a transfer necessary by decertifying a facility. Id.* at 784, 100 S.Ct. at 2475 (emphasis added).

That Court was also unpersuaded by the "transfer trauma" argument, even though they proceeded on the assumption that there was a risk that some residents could encounter severe emotional and physical hardship as a result of transfer. The assumed risk to life and liberty was an "indirect and incidental result of the Government's enforcement action [and hence did] not amount to a deprivation of any interest in life, liberty or property." *Id.* The Court more fully explained:

Medicaid patients who are forced to move because their nursing home has been decertified are in no different position for purposes of due process analysis than financially independent residents of a nursing home who are forced to move because the home's state license has been revoked. Both groups of patients are *indirect beneficiaries of government programs designed to guarantee a minimum standard of care for patients as a class. Both may be injured by the closing of a home* due to revocation of its state license or its decertification as a Medicaid provider. Thus, whether they are private patients or Medicaid patients, some may have difficulty locating other homes they consider suitable or may suffer both emotional and physical harm as a result of the disruption associated with their move. *Yet none of these patients would lose the ability to finance his or her continued care in a properly licensed or certified institution. . . .*

The simple distinction between government action that directly affects a citizen's legal rights, or imposes a direct restraint on his liberty, and action that is directed against a third party and affects the citizen only indirectly or

incidentally, provides a sufficient answer to all of the cases on which the patients rely in this Court. *Id.* at 787, 100 S.Ct. at 2476 (emphasis added).

Therefore, no statutory or constitutional rights existed to prevent the transfer of the Town Court patients.

Similarly in the instant proceeding, the appellants' decision to close Retreat imposes no direct restraint on the patients' life or liberty. That decision was made in the interest of the entire state-wide mental health program in order to maximize utilization of available resources. Exercising their statutorily imposed powers and duties, appellants have determined the transfers necessary to maintain adequate standards of treatment.[5] Objections to this determination should be voiced in the political arena. As noted in Mr. Justice Blackmun's concurring opinion in *Town Court*:

> The determinative question is whether the litigant holds such a legitimate "claim of entitlement" that the Constitution, rather than the political branches, must define the procedures attending its removal . . . Claims of entitlement spring from expectations that are "justifiable," *Vitek v. Jones*, 445 U.S. 480, at 489, 100 S.Ct. 1254, at 1261, 63 L.Ed.2d 552 (slip op., at 7), "protectable," *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, at 7, 99 S.Ct. 2100, at 2104, 60 L.Ed.2d 668; "sufficient," *Bishop v. Wood*, 426 U.S. 341, at 344, 96 S.Ct. 2074, at 2077, 48 L.Ed.2d 684; or "proper," *id.*, at 362, 96 S.Ct. at 2085 (dissenting opinion). In contrast, the Constitution does not recognize expectancies that are "unilateral," *Board of Regents v. Roth*, 408 U.S. 564, at 577, 92 S.Ct. 2701, at 2709, 33 L.Ed.2d 548, or "too ephemeral and insubstantial." *Meachum v. Fano*, 427 U.S. 215, 228, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451 (1976).

> .     .     .     .     .

> *Reason and shared perceptions should be consulted to define the scope of the claimant's "justifiable" expectations. Nor should constitutional policy be ignored in deciding whether constitutional protections attach. This*

---

5. See note 2, supra for factors considered by appellants in the decision to close Retreat.

*approach not only permits sensible application of due process protections; it reflects the unremarkable reality that reasonable legal rules themselves comport with reasonable expectations. Id.* at 796, 100 S.Ct. at 2481 (emphasis added).

Mr. Justice Blackmun then identified several considerations leading him to conclude that a patient has no constitutional entitlement to residence in a particular facility. One of these considerations was that Town Court was the *underlying source* of the benefits the patients sought to retain. As Mr. Justice Blackmun notes:

this fact is important, for the property of a recipient of public benefits must be limited, as a general rule, *by the governmental power to remove, through prescribed procedures, the underlying source of those benefits.* The Constitution would not have entitled John Kelly to a fair hearing if New York had chosen to disband its public assistance programs rather than to cut off his particular award. See *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Nor would Texas have had to afford process to Professor Sindermann had it decided for budgetary reasons to close Odessa Junior College. See *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). And we would be surprised to learn that Dwight Lopez had a constitutional right to procedures before the Ohio Department of Education suspended classes at Columbus High School for 10 days due to the discovery of faulty electrical wiring requiring that must time for repair work. See *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). *These observations comport with common understanding and shared expectations.* A farmer may sue for conversion if his upstream neighbor improperly diverts his water. But both can only grumble if the spring rains cease and the river runs dry. *Id.* at 798, 100 S.Ct. at 2482 (emphasis added).

So too in the within proceedings, those charged with assuring adequate mental health treatment throughout the Commonwealth have decided to eliminate one of the underlying sources of that treatment, Retreat State Hospital. Common

understanding recognizes that particular facilities are not immune from deterioration and that they therefore will, at some point, outlive their usefulness. When that point is reached, it is reasonable for a patient to expect to receive adequate treatment somewhere—it is unreasonable to expect to receive it at that particular facility.

■ We do not wish to seem callous to any risks of "transfer trauma" to which Retreat residents might be exposed. However, the record in the instant case leads us to the same conclusion reached by Mr. Justice Blackmun in *Town Court*:

> ... the patients cannot establish that transfer trauma is so substantial a danger as to justify the conclusion that transfers deprive them of life or liberty. Substantial evidence suggests that "transfer trauma" does not exist, and many informed researchers have concluded at least that this danger is unproved. *Recognition of a constitutional right plainly cannot rest on such an inconclusive body of research and opinion. Id.* at 804, 100 S.Ct. at 2485 (footnote 13 omitted—emphasis added).

As the Chancellor herein has made no findings of fact, it is unclear whether he found the risk of "transfer trauma" to be a real one, or whether his decision was based purely on section 207 of the Mental Health Procedures Act. Our review of the record, however, reveals substantial evidence that the fears of "transfer trauma" are largely unfounded. Several expert witnesses for the Commonwealth, including the superintendents for the receiving state facilities, testified as to the actual "track record" of prior transferees from Retreat. That "track record" contradicts that transfer risks asserted by appellees as justification for the preliminary injunction. The principal evidence offered by appellees to support their claims of "transfer trauma" danger was that of a Dr. Norman C. Bourestom, a Michigan psychologist. Dr. Bourestom visited Retreat for three days, studied the patients' histories and charts, then concluded that, based upon his research and findings of certain nursing home facilities, a substantial danger of "transfer trauma," including lethal consequences, existed for Retreat patients. Dr.

Bourestom testified the dangers of "transfer trauma" were significant only when the danger involved a "radical change" which occurs when there is a substantial change in (1) the staff, (2) the patient's peer group, (3) the program of treatment and (4) the physical environment. Dr. Bourestom then stated he felt the proposed transfers would involve a radical change. As Dr. Bourestom had never visited the receiving facilities, and as appellants' witnesses testified that, to the fullest extent possible, peers and staff would be relocated in the same wards and that the respective treatment programs and physical environments were similar, Dr. Bourestom's characterization of the proposed changes as "radical" is dubious, and is certainly contradicted by Retreats' prior experience. At any rate, here, as in *Town Court*, recognition of a constitutional right to remain in a particular facility cannot rest on such an insubstantial record concerning the dangers of transfer.

For the foregoing reasons, the order of the Commonwealth Court is reversed and the preliminary injunction is dissolved.

KAUFFMAN, J., did not participate in the consideration or decision of this case.

## APPENDIX A

### ORDER

AND NOW, this 19th day of May, 1980 upon consideration of the affidavits, evidence, testimony and cogent arguments of counsel Petitioners' amended Motion for Contempt is dismissed.

However, it appearing that additional action and clarification is necessary to protect the health and welfare of the residents at Retreat State Hospital and to ensure the continuation of quality medical care, this Court's order of April 14, 1980 is hereby amended to provide:

A. Respondents, their representatives, agents and assigns, together with all persons acting in concert therewith, are hereby restrained from;

1. Removing or transferring any resident of Retreat State Hospital to any other medical or nursing facility without the express consent of that resident or his guardian.

2. Initiating conversation or activity relating to transfer or, inducing or requesting from any resident at Retreat State Hospital or his guardian consent to transfer to another facility. *Provided*: that nothing in this order shall prohibit Respondents, their agents, and assigns (a) from answering questions, supplying resident or his guardian to solicit consent, to provide information, and to prepare the patient for transfer where consent is obtained.

D. Respondents shall have a wide range of discretion in the methods utilized in the solicitation process but shall not use coercion or harassment.

1. Coercion is defined as the "use of physical or moral force to compel to act or consent." Websters Third International Dictionary 439 (1966).

2. Harassment is defined as the "act or instance of vexing, troubling, or annoying continually or chronically." Websters Third International Dictionary 1031 (1966).

E. Inquiries of residents or their guardians relating to transfer or a proposed transfer site shall be reported by employees in accordance with hospital procedures, to those persons specified by the Respondents and noted in the resident's medical chart.

F. Employees, their agents, assigns, and representatives, together with any party acting on their behalf, are hereby restrained from:

1. Soliciting or in any way requesting or encouraging a resident or his guardian to withhold consent or to revoke consent once consent to transfer is given.

2. Impeding, hindering or in any way failing to cooperate in the care, treatment and transport of any resident, where consent to transfer has been obtained.

G. Where a resident is believed to be incompetent this order shall not prohibit Respondents, their representatives, agents, and assigns, together with all persons acting in

concert therewith, from petitioning the Common Pleas Court of the County of residence for a determination of competency and the appointment of a guardian.

H. Where chronically disabled persons 70 years of age or older have been continuously hospitalized in a state operated facility for at least 10 years and are unable to give a rational informed consent:

1. Section 102 of the Mental Health Procedures Act, Act of July 6[9], 1976, *as amended*, P.L. 817, 50 P.S. § 7102, shall not exempt such persons from the orders of this Court except as set forth below.

2. Consent to transfer provided by the treating physician may be substituted for the actual express consent of the resident where, after examination of the resident and the resident's medical records, the treating physician deems it to be in the best medical interest of the resident to transfer, provided, however;

a. The resident is informed of the recommendation of his doctor for transfer to another facility and the reasons for such recommendation including the status of his present medical condition, the nature of care necessary to maintain or improve that status, and the type of care available at the proposed transfer site.

b. The resident is informed of his right to object to the transfer and to remain at Retreat State Hospital.

3. Where an individual lodges an objection either at the time of the recommendation for transfer or any time prior to transfer, the resident shall not be transferred until a guardian is appointed by the Common Pleas Court and said guardian consents to said transfer.

4. Where a guardian is appointed, solicitation of the guardian may only proceed in accordance with the terms of this order.

5. Nothing in this section shall be construed to apply to chronically disabled persons 70 years of age or older who have been continuously hospitalized in a State operated

facility for a least 10 years and who are competent to give a rational informed consent. Express consent shall be required of such resident.

6. Disputes as to competency may be raised by either party at any time.

7. Where written notice is received by Respondents that a dispute as to competency has been raised under this section, solicitation shall cease and the resident may not be transferred until final disposition of said dispute in accordance with subsection 8 below.

8. Where there is a dispute concerning a resident's competency to provide informed rational consent, upon notification in writing to Respondents, the resident shall be examined by three (3) psychiatrists who shall evaluate the resident's competency.

    a. The three psychiatrists shall be selected as follows:

      (1) One by the Petitioners.

      (2) One by the Respondents.

      (3) One by mutual agreement of the parties.

    b. Where two or more psychiatrists are of the opinion that the resident is competent to give a rational informed consent, then the resident shall be deemed competent and the terms of this section shall not apply. Otherwise, substitute consent as provided at subparagraph 2 shall be effective.

I. Respondents, their agents and assigns shall be permitted to utilize involuntary commitment proceedings in accordance with Sections 301–306 of the Mental Health Procedures Act, Act of July 9, 1976, *as amended,* P.L. 817, 50 P.S. §§ 7301–7306.

*Provided* : that such procedures are not utilized with the purpose of intent of circumventing the consent provisions of section A of this order.

J. Any appeal taken by Respondent of this Order shall not operate as an automatic supercedeas pursuant to Rule 1736, Pa.R.A.P.

/s/ JAMES C. CRUMLISH,
    President Judge