479 A.2d 452

**Leo J. WILLMAN and Jaden Electric Division of the Farfield Company, Appellants,**

**v.**

**CHILDREN'S HOSPITAL OF PITTSBURGH, Mellon-Stuart Company, and Allegheny County Hospital Development Authority, Appellees.**

Supreme Court of Pennsylvania.

Argued March 5, 1984.

Decided June 28, 1984.

Kenneth M. Cushman, Barbara W. Mather, Eleanor N. Ewing, Stephen E. Bozzo, Pepper, Hamilton & Scheetz, Philadelphia, for appellants.

John E. Beard, III, Kirkpatrick, Lockhart, Johnson & Hutchinson, Pittsburgh, for Mellon-Stuart Company.

Daniel I. Booker, Reed, Smith, Shaw & McClay, Pittsburgh, for Children's Hosp. of Pgh.

Joseph W. Conway, Pittsburgh, for Allegheny County Hospital Development Authority.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT and ZAPPALA, JJ.

## OPINION

LARSEN, Justice.

In 1977, Children's Hospital of Pittsburgh (Children's), a private non-profit charitable corporation initiated an extensive construction and renovation project. The plans included the erection of a new main hospital facility. In 1979, Children's proceeded to implement the renovation project by entering into a Construction Management Agreement with Mellon-Stuart Company, a private business corporation.

Under the terms of the agreement, Mellon-Stuart obligated itself to perform all construction management services including, inter alia, the solicitation of bids, the development of bidder interest, the receiving and evaluation of competitive bids for all trade contracts, and the entering into trade contracts with various trade contractors and material suppliers. Further, the agreement stipulated that no contract for trade services or supplies could be made by Mellon-Stuart without the prior approval of Children's. Additionally, when the actual construction phase of the project started, Mellon-Stuart was required to provide all necessary construction site supervisory and administrative services for complete construction within the budget and time schedule. The agreement further provided that Mellon-Stuart would complete the entire construction project for a guaranteed maximum price.[1]

The guaranteed maximum price provisions meant that if the actual cost of completing the project was less than the maximum price, then Children's would pay Mellon-Stuart only the actual cost. If, however, the actual cost exceeded the maximum price, Mellon-Stuart would be solely liable for the excess. In no event would Children's be liable for any costs over and above the guaranteed maximum price.

---

**1.** The affidavit of David F. Figgins, President of Mellon-Stuart sets forth that Mellon-Stuart guaranteed that the cost of construction would not exceed $55,160,060.00, subject to the qualifications and exclusions set forth in the guaranteed maximum price amendment to the Construction Management Agreement.

Financing of the renovation project was to be accomplished in large part by the sale of Hospital Revenue Bonds, Series W, issued through the Allegheny County Hospital Development Authority (Authority). The Authority is a "body politic and corporate" existing under the laws of Pennsylvania pursuant to the Municipality Authorities Act of 1945.[2] It was created in 1971 to provide funds through the issuance of bonds and notes to assist non-profit hospitals in Allegheny County to finance hospital construction.

Under the financing arrangements established for the project, the Authority issued Series W bonds pursuant to a trust agreement between the Authority and Mellon Bank, N.A. as trustee.[3] A lease was entered into between the Authority and Children's under which Children's leased the hospital premises to the Authority. The terms of the lease called for the Authority to pay a lump sum fixed rental for the premises equal to the net proceeds realized from the issuance and sale of the Series W bonds. Simultaneous with the execution of the lease, a sublease was executed by the Authority and Children's under which the Authority sublet the premises back to Children's. The sublease is a general obligation of Children's, and as rent Children's agreed to make payments to the Authority in the full amount necessary to pay the principal, interest and premiums, if any, on the Series W bonds. Further, the Authority and the trustee, Mellon Bank, N.A. executed an indenture in

2. Act of 1945, May 2, P.L. 382 § 1 et seq. as amended, 53 P.S. § 301 et seq.

3. The official statement published in connection with the bond issue states: "The Series W Bonds are limited obligations of the Authority and neither the general credit of the Authority nor the general credit or taxing power of the Commonwealth of Pennsylvania or any political subdivision thereof is pledged for the payment of the Series W Bonds, nor will the Series W Bonds be or be deemed to be an obligation of the Commonwealth of Pennsylvania or of any political subdivision thereof. The Authority has no taxing power. The Series W Bonds will be secured under the provisions of the Indenture, the Lease and the Sublease, as each is referred to herein, and will be equally and ratably payable solely from Receipts and Revenues derived by the Authority under its Sublease with, and additionally secured by the guaranty of Children's Hospital of Pittsburgh."

which the Authority assigned all of its right, title and interest in and to the sublease to the trustee and pledged to the trustee the receipts and revenues payable to the Authority under the sublease.

Pursuant to its obligations under the Construction Management Agreement, Mellon-Stuart proceeded to solicit bids from qualified trade contractors so that the construction project could be accomplished in the most economical manner. For the electrical portion of the job, Mellon-Stuart privately solicited bids from seven electrical contractors and received bids from six. Appellant Jaden Electric Division of the Fairfield Company (Jaden), not being one of contractors solicited, sought to obtain a set of the bidding documents for the electrical construction contract so that it could submit a bid. Mellon-Stuart refused to furnish Jaden with the appropriate documents indicating that it did not wish to entertain a bid from Jaden.[4]

Jaden and Leo J. Willman[5] filed suit in equity against Children's, Mellon-Stuart and the Authority seeking, inter alia, an injunction enjoining defendants from opening bids or awarding or executing any contracts for the construction project, along with an Order directing that Jaden be provided with all bidding documents, and permitting Jaden to submit a bid for the electrical construction work.

The trial court denied appellants' petition for a preliminary injunction ruling that the defendants were not required to employ public competitive bidding for the letting

4. In his affidavit, David Figgins, President of Mellon-Stuart stated: "Overall Project cost can be vitally affected by a contractor's ability to perform a particular project at a particular time. Thus, in pre-qualification, Mellon-Stuart considers the trade contractor's experience on similar projects, present volume of work, financial strength, ability to timely complete its work, available skilled work force, quality of work and ability to coordinate and cooperate with other contractors. Mellon-Stuart invited competitive bidding from those trade contractors which, in Mellon-Stuart's professional judgment, are qualified on all criteria for their specific bid package."

5. Leo J. Willman, Vice-President of Jaden, avers that he is a taxpayer of the Commonwealth of Pennsylvania and brings this action on behalf of himself and all other taxpayers.

of contracts in the Children's project and thus, Jaden was properly denied the privilege of submitting a bid. The Commonwealth Court affirmed the trial court's order.[6] We granted appellants' petition for allowance of appeal.

The standard of review on appeal from the grant or denial of a preliminary injunction has been repeatedly stated:

> As a preliminary consideration, we recognize that on an appeal from the grant or denial of a preliminary injunction, we do not inquire into the merits of the controversy, but only examine the record to determine if there were any apparently reasonable grounds for the action of the court below. Only if it is plain that *no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous or misapplied* will we interfere with the decision of the Chancellor. *Intraworld Inc. v. Girard Trust Bank*, 461 Pa. 343, 336 A.2d 316 (1975); *Credit Alliance Corp. v. Philadelphia Minit-Man Car Wash Corp.*, 450 Pa. 367, 301 A.2d 816 (1973); *Zebra v. Pittsburgh School District*, 449 Pa. 432, 296 A.2d 748 (1972). "In order to sustain a preliminary injunction, *the plaintiff's right to relief must be clear, the need for relief must be immediate, and the injury must be irreparable if the injunction is not granted.*" *Zebra v. Pittsburgh School District*, 449 Pa. at 437, 296 A.2d at 750. (emphasis added). *Roberts v. School District of Scranton*, 462 Pa. 464, 469, 341 A.2d 475, 478 (1975). (emphasis added).

*Bell v. Thornburgh*, 491 Pa. 263, 420 A.2d 443 (1980); also: *Ezy Parks v. Larson*, 499 Pa. 615, 454 A.2d 928 (1982); *Shenango Valley Osteopathic Hospital v. Dept. of Health*, 499 Pa. 39, 451 A.2d 434 (1982); *Singzon v. Dept. of Public Welfare*, 496 Pa. 8, 436 A.2d 125 (1981). Our task then is to scan the record to determine if the denial of appellants' request for a preliminary injunction was based upon apparently reasonable grounds.

6.  74 Pa.Cmwlth. 67, 459 A.2d 855 (1983).

The appellants argue that open competitive bidding is mandated by the Municipality Authorities Act for all construction projects which involve an Authority. It is asserted that the defendants' refusal to accept a bid from appellant Jaden is a palpable violation of this act.

Section 10 of the Act provides, in pertinent part, as follows:

> All construction, reconstruction, repairs or work of any nature *made by* any Authority, where the entire cost, value or amount of such construction, reconstruction, repairs or work, including labor and materials, shall exceed two thousand five hundred dollars ($2,500), ... shall be done only under contract or contracts to be entered into by the Authority with the lowest responsible bidder upon proper terms, after due public notice has been given asking for competitive bids as hereinafter provided. (emphasis supplied)

Act of May 2, 1945, P.L. 382, as amended, 53 P.S. § 312(A).[7]

The appellants argue that the phrase *made by* as used in Section 10 quoted above should be construed broadly to include financing by tax-free bonds or any property interest of an Authority in a project.

The trial court found that the Children's Construction Plan is a private project not involving public funds or public credit. The phrase *made by* was interpreted restrictively to require public competitive bids only when the Authority is a party to a contract as described in Section 10. Since, in this case, the Authority is not a party to any construction contract nor is it involved in the actual construction of the project, the court concluded that the owners may enter into contracts with whomever they choose. In affirming the trial court, the Commonwealth Court held that "public competitive bidding is not required where, as here, the Authority has not undertaken to manage or construct the project in question." [8]

7. This section of the Act now provides for competitive bids where the cost or value exceeds Four Thousand ($4,000.00) Dollars.

8. 74 Pa.Cmwlth. at 73, 459 A.2d at 858.

The principal issue presented by this appeal is whether the Authority's role in providing a financing channel for the Children's project constitutes "Construction, reconstruction, repairs or work of any nature made by [an] authority", (53 P.S. 312(A)) thus requiring all trade and material contracts to be let only to the lowest responsible bidder on a public competitive bid basis as specified by Section 10. In deciding this question it is useful to consider the reasons for an open competitive bid requirement.

In the letting of important public contracts for public work, it is generally considered that the interests of the public are best served by submitting such contracts to open competitive bidding. 64 Am.Jur.2nd § 34, p. 886.

The purposes of provisions requiring that contracts with public authorities be let only after competitive bidding are to secure economy in the construction of public works and the expenditures of public funds for materials and supplies needed by public bodies; to protect the public from collusive contracts; to prevent favoritism, fraud, extravagance, and improvidence in the procurement of these things for the use of the state and its local self-governing subdivisions; and to promote actual, honest, and effective competition to the end that each proposal or bid received and considered for the construction of a public improvement, the supplying of materials for public use, etc., may be in competition with all other bids upon the same basis, so that all such public contracts may be secured at the lowest cost to taxpayers.

81 A.L.R.3rd PP. 981–82.

■ The contract in question, indeed the entire project, does not involve the use or risk of public funds or public credit. None of the costs of construction is borne by the taxpayers. We do not believe that the legislature intended to require open competitive bidding where an authority merely serves as a financing conduit for an entirely private project. *Compare: Clearfied Area Housing Corp. v. Hughes,* 13 Pa.Cmwlth. 96, 318 A.2d 754 (1974). "The object of all interpretation and construction of statutes is to

ascertain and effectuate the intention of the General Assembly". *Statutory Construction Act,* 1972, Dec. 6, P.L. 1339, No. 290 § 3(a), 1 Pa.C.S.A. § 1921(a). The obvious intention of a public competitive bidding requirement is to secure public contracts for the use of the government or a governmental body at the lowest cost to the taxpayers. In this case we are dealing with a private undertaking at no cost to the taxpayers. The reasons for open competitive bids do not exist. As the Commonwealth Court noted, "[t]he legislature could have, but did not, state in Section 10 of the Act that all projects *financed* by an authority are subject to public competitive bidding requirements." [9] The Children's project is a private project, backed by private property and private funds and is to be managed and constructed by private parties. The Authority's role is limited to providing a financing vehicle to assist the private parties in the construction of a new hospital facility. Under such circumstances, the public competitive bidding requirement of Section 10 does not apply.

■ Next, the appellants argue that open competitive bidding is required by the *"General Guidelines for obtaining Long Term Financing of Hospital Facilities through the Allegheny County Hospital Development Authority"* adopted and issued by the Authority. The Guidelines, in pertinent part, provide:

(a) *Competitive Bids: Where construction is initially undertaken by ACHDA* [Allegheny County Hospital Development Authority], ACHDA will take by assignment all plans and specifications for the project and will competitively bid the construction work as required by the Act [Pennsylvania Municipality Authorities Act of 1945]. However, where it is to the economic advantage of the hospital to proceed in stages with the construction program, ACHDA will participate in such program by permitting the hospital to initially award contracts with subsequent assignments thereof to ACHDA. All contracts so awarded by the hospital must have been first

9. Id. 74 Pa.Cmwlth. at 74, 459 A.2d at 858–59.

made the subject of competitive bidding in accordance with the Act.

> *Guaranteed maximum contracts* properly bonded with construction managers are *permissible, provided all sub-contract work* done under such guaranteed maximum contracts *is awarded on a competitive basis.*

(R. 30a, Article VI(a)); (emphasis added).

The appellants urge that the Authority's Guidelines are official regulations of binding force and under them the appellees are bound to invite open competitive bidding for all trade contracts, including the one for electrical work. The appellees, on the other hand, argue that the Guidelines constitute a general statement of policy and are only informational in nature; thusly, appellees argument continues, they are not binding regulations and have never been treated as such by the Authority.

Whether or not the Guidelines are binding regulations, we believe that under the circumstances of this case public competitive bidding is not required. The project here involves a guaranteed maximum contract with Mellon-Stuart serving as construction manager under agreement with Children's. This kind of contractual arrangement is specifically authorized by the second paragraph of Section VI(a) of the Guidelines.

Section VI(a) distinguishes between construction projects where the Authority is involved in the construction and those in which the owner opts to proceed under a guaranteed maximum contract with a construction manager. In cases where construction is initially undertaken or subsequently assumed by the Authority, the Guidelines explicitly state that all work shall be competitively bid "as required by the Act," and all contracts shall be awarded "in accordance with the Act." (Municipality Authorities Act of 1945, 53 P.S. § 312(A), which calls for public competitive bids). The paragraph of Section VI(a) dealing with projects involving guaranteed maximum contracts sets forth that all sub-contract work is to be awarded on a *competitive basis.* Inasmuch as no form of the qualifying phrase "as required

by the Act" is included in the paragraph pertaining to guaranteed maximum contracts we conclude that *private* as well as public competitive bids are permitted.

In the case *sub judice,* Mellon-Stuart awarded the contract in question after privately soliciting and receiving competitive bids from several pre-qualified contractors. This procedure is within the Authority's Guidelines relating to guaranteed maximum contracts. We find no error in denying appellants' request for a preliminary injunction, and therefore, the order of the Commonwealth Court is affirmed.

McDERMOTT, J., filed a Dissenting Opinion which NIX, C.J., joins.

HUTCHINSON and PAPADAKOS, JJ., did not participate in the consideration or decision of this case.

McDERMOTT, Justice, dissenting.

The issue here is whether a municipal authority may dodge statutorily mandated competitive bidding procedures through an imaginative financing scheme. The plan in question placed the management of a project in the hands of an agent when the project was financed in great part by the municipal authority's tax-free revenue bonds.[1]

The majority holds that the strategy employed by the Allegheny County Hospital Development Authority ("Authority") Children's Hospital, Mellon-Stuart and the Mellon Bank survives without competitive bidding since the contracts here were made by the private parties engaged as agents, and that the Authority itself did not make the contracts or the construction. To reach this result, the majority strictly construes the "made by" language of section 312(A) of the Municipal Authority Act:[2]

1. $54.5 million of the $74.3 million project was provided by the sale of the Authority's bonds.

2. Act of February 18, 1982, P.L. 86, No. 31, § 2 as amended, 53 P.S. § 312(A).

All construction, reconstruction, repairs or work of any nature *made by* any Authority, where the entire cost, value or amount of such construction, reconstruction, repairs or work, including labor and materials, shall exceed four thousand dollars ($4,000), . . . shall be done only under contract or contracts to be entered into by the Authority with the lowest responsible bidder upon proper terms, after due public notice has been given asking for competitive bids as hereinafter provided. (Emphasis supplied.)

53 P.S. § 312(A).

I disagree with the majority's resolution of this ambiguity. I believe the language of the statute must be broadly construed to effectuate the important public policies sought by the legislature when, in 1945, it mandated a system of competitive bidding for contracts involving municipal authorities.

Cutting away the complex financial minutiae of this case, we have a relatively simple problem of statutory construction. However, the majority has turned the traditional rules of statutory construction upside down, recklessly allowing an evisceration of a vital component of the Municipal Authorities Act.

"The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a); [3] *Casey v. Pennsylvania State University*, 463 Pa. 606, 615, 345 A.2d 695, 700 (1975); *Commonwealth v. Monumental Properties, Inc.*, 459 Pa. 450, 467, 329 A.2d 812, 820 (1974). Further, statutory language should be liberally construed to effectuate legislative intent. 1 Pa.C.S. § 1928(c). In ascertaining legislative intent, the court should look to the mischief sought to be remedied. 1 Pa.C.S. § 1921(c)(3).[4]

**3.** Statutory Construction Act, Act of December 6, 1972, No. 290, § 3, 1 Pa.C.S. § 1501 et seq.

**4.** Another rule of statutory construction directs that we ascertain legislative intent through administrative interpretations. 1 Pa.C.S. § 1921(c)(8); *Hospital Association of Pennsylvania v. MacLeod*, 487

This Court has previously stated the end sought to be gained by competitive bidding: "guarding against favoritism, improvidence, fraud, and corruption in the awarding of public contracts." *Weber v. City of Philadelphia*, 437 Pa. 179, 262 A.2d 297 (1970); *Yohe v. City of Lower Burrell*, 418 Pa. 23, 28, 208 A.2d 847, 850 (1965); *Corcoran v. City of Philadelphia*, 363 Pa. 606, 609, 70 A.2d 621, 623 (1950). In *Price v. City of Philadelphia Parking Authority*, 422 Pa. 317, 221 A.2d 138 (1966), this Court held that the competitive bidding provision of the Parking Authority Law [5] should be read liberally to encompass the need to bid out leases to air space above proposed parking lots. Because the leases were not bid out, the leases were held void. The Court, emphasizing the public policy sought to be furthered, cautioned against circumventing statutory competitive bidding requirements. We should follow that lead. *Price v. Philadelphia Parking Authority, supra*, 422 Pa. at 332, 221 A.2d at 146. *See also, Conduit and Foundation Corp. v. City of Philadelphia*, 41 Pa.Cmwlth.Ct. 641, 401 A.2d 376 (1979).

The policies underlying competitive bidding have also been stressed by commentators and courts of other jurisdictions. *See,* 10 McQuillin, Municipal Corporations § 29.29 (1979); Note, "The Necessity of Competitive Bidding in

Pa. 516, 523, 410 A.2d 731, 734 (1980); *See also, Morton v. Ruiz,* 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). Here, the "General Guidelines for Obtaining Long-Term Financing of Hospital Facilities through the Allegheny County Hospital Development Authority under the Municipality Authorities Act of 1945, as amended" requires hospitals and their agents to award construction contracts in accordance with competitive bidding requirements. The requirements state:

Competitive Bids: Where construction is initially undertaken by ACHDA [Allegheny County Hospital Development Authority], ACHDA will take by assignment all plans and specifications for the project and will competitively bid the construction work as required by the Act [Municipality Authorities Act of 1945]. However, where it is to the economic advantage of the hospital to initially award contracts with subsequent assignments thereof to ACHDA. *All contracts so awarded by the hospital must have been first made the subject of competitive bidding in accordance with the Act.*
Article VI(a). (Emphasis supplied.)

5. Act of June 5, 1947, P.L. 458, § 11, 53 P.S. § 351.

Municipal Contracts," 27 U.Pitt.L.Rev. 117, 123 (1965); Annot., 81 A.L.R.3d 979, 981–82 (1972); *Istari Construction, Inc. v. City of Muscatine,* 330 N.W.2d 798 (Iowa 1983); *John J. Brennan Construction Co. v. City of Shelton,* 187 Conn. 695, 448 A.2d 180 (1982); *Libby v. City of Dillingham,* 612 P.2d 33 (Alaska 1980); *Marriott Corporation v. Metropolitan Dade County,* 383 So.2d 662 (Fla.App.1980); *LeCesse Bros. Contracting, Inc. v. Town Board of Town of Williamson,* 62 A.D.2d 28, 403 N.Y.S.2d 950 (1978), *aff'd* 46 N.Y.2d 960, 415 N.Y.S.2d 413, 388 N.E.2d 737 (1979); *Platt Electric Supply, Inc. v. City of Seattle, Division of Purchasing,* 16 Wash.App. 265, 555 P.2d 421 (1976); *Seaboard Construction Co. v. Atlantic City,* 204 F.2d 163 (3d Cir. 1953); *Cyr v. White,* 83 Cal.App.2d 22, 187 P.2d 834 (1947); *Coller v. City of St. Paul,* 223 Minn. 376, 26 N.W.2d 835 (1947).

Additionally, courts have held that statutory competitive bidding requirements must be construed against a municipal authority seeking to avoid the requirements: When there is an ambiguity, bid. *See Cabe v. Union Carbide Corp.,* 644 S.W.2d 397, 403 (Tenn.1983); *Cosentino v. City of Omaha,* 186 Neb. 407, 183 N.W.2d 475 (1971).

The majority argues that the oft-stated concerns which motivated the legislature to mandate competitive bidding are not implicated here since public funds were not involved. Thus, the majority urges, since the squandering of private funds was not what concerned the legislative, competitive bidding was not required. It is true that the funds provided by the Authority were not gained from the taxpayers. However, it would be incorrect to label the $54 million involved as purely private moneys. The $54 million was gained from revenue bonds floated by the ACHDA, a public authority.[6] Public officers were responsible for investing the funds raised by the Authority. *See Commonwealth ex rel. McCreary v. Major,* 343 Pa. 355, 22 A.2d 686 (1941). In exchange for the funds provided, the Authority was granted a leasehold interest in the hospital premises until the

6. Act of May 2, 1945, P.L. 382, § 1, 53 P.S. § 301 et seq.

year 2014. And, probably most important, the funds provided by the Authority were tax-free: taxpayers leveraged this project.

If we were to endorse this exemption from the competitive bidding process, nothing would prevent other Commonwealth authorities from skirting competitive bidding requirements: merely employ the device the majority provides for them. Rather than have the authority itself construct and contract for a project, funnel the tax-free funding through the authority to an agent, a private company, which would in turn manage the project and make all the contracts for the project. With the perceived annoyance of competitive bidding out of the way, the agent or the public official who appointed the agent could award his friends and political allies lucrative contracts. The concerns of favoritism, improvidence, fraud and corruption, while not hinted at in this case, are implicated when competitive bidding procedures are avoided through a scheme like the one employed here.

Appellees might complain that competitive bidding is an onerous burden. The Children's Hospital project is certainly an important one. However, it cannot be said that competitive bidding would unduly handicap such a project. Competitive bidding has successfully passed the test of time, governing the award of municipal authority contracts in the Commonwealth since 1945, and other governmental contracts since the turn of the century. It is not so much to ask that, in exchange for the $54 million of tax-free financing, the parties competitively bid out contracts as required by statute.

Further, competitive bidding requirements are not inflexible and unyielding. The statute requires contracts to go to the *lowest responsible bidder,* giving some discretion to the Authority and/or its agent. 53 P.S. § 312(A), *supra.* If, as alleged here, appellants were not qualified for the job, their bids could have been rejected under the Act.

The Children's Hospital project *was made possible by* the public Authority. Competitive bidding procedures should

be adhered to when an Authority, operating under the Municipal Authorities Act, provides the financing for a project's construction, repair and other work.

Since the lower courts' construction of the statute was not a reasonable one, I would reverse the order of the Commonwealth Court.

NIX, C.J., joins in this dissenting opinion.