127 A.3d 783

Rebecca SERNOVITZ and Lawrence Sernovitz, Individually and as Parents and Natural Guardians of Samuel Sernovitz

v.

Stuart Z. DERSHAW, M.D., John Stack, M.D., Laura Borthwick–Scelzi, M.D., Margaret M. Fillinger, CRNP, Women's Care of Montgomery County, Holy Redeemer Hospital and Medical Center and Holy Redeemer Health System, Inc.

The General Assembly of the Commonwealth of Pennsylvania, Intervenor.

Appeal of Stuart Z. Dershaw, M.D., John Stack, M.D., Laura Borthwick–Scelzi, M.D., Margaret M. Fillinger, CRNP, Women's Care of Montgomery County, Holy Redeemer Hospital and Medical Center and Holy Redeemer Health System, Inc.

Rebecca Sernovitz and Lawrence Sernovitz, Individually and as Parents and Natural Guardians of Samuel Sernovitz

v.

Stuart Z. Dershaw, M.D., John Stack, M.D., Laura Borthwick–Scelzi, M.D., Margaret M. Fillinger, CRNP, Women's Care of Montgomery County, Holy Redeemer Hospital and Medical Center and Holy Redeemer Health System, Inc.

The General Assembly of the Commonwealth of Pennsylvania, Intervenor.

Cross Appeal of the General Assembly of the Commonwealth of Pennsylvania, Intervenor.

Supreme Court of Pennsylvania.

Argued May 6, 2015.

Decided Nov. 18, 2015.

Jonathan F. Bloom, Esq., Ian Michael Long, Esq., Karl Stewart Myers, Esq., Stradley, Ronon, Stevens & Young, L.L.P., Philadelphia, David E. Somers III, Esq., for General Assembly of the Commonwealth of Pennsylvania.

Richard P. Abraham, Esq., Theodore J. Caldwell Jr., Esq., Young Ricchiuti Caldwell & Heller, L.L.C., Philadelphia, for Rebecca & Lawrence Sernovitz.

Donald N. Camhi, Esq., Sheila Ann Haren, Esq., Barbara S. Magen, Esq., Post & Schell, P.C., Philadelphia, for Stuart Z. Dershaw, M.D., Holy Redeemer Health System, Inc., et al.

SAYLOR, C.J., EAKIN, BAER, TODD, STEVENS, JJ.

## OPINION

Chief Justice SAYLOR.

In this discretionary appeal, we address a legislative-process challenge to a 1988 enactment raised in the context of a professional negligence lawsuit filed in 2010 and asserting causes of action for wrongful birth.

By way of background, the legislation in issue—Act 47 of 1988 ("Act 47")—began as a bill which contained a single provision relating to the appointment of substitute bail commissioners in Philadelphia. During its passage through the General Assembly, it was amended several times. In its final form, the bill contained multiple substantive sections, all amending Title 42 of the Pennsylvania Consolidated Statutes, that is, the Judicial Code. In addition to its original provision, the bill encompassed sections which: repealed the Post Conviction Hearing Act ("PCHA") and enacted the Post Conviction Relief Act ("PCRA") in its place; conferred on this Court exclusive jurisdiction to hear appeals in capital cases; mandated minimum sentences for offenses committed while impersonating a law enforcement officer; precluded the dismissal of felony charges at a preliminary hearing solely due to the prosecutor's or victim's failure to appear; limited defenses against claims for injuries sustained while *in utero;* and precluded causes of action for wrongful birth and wrongful life. The bill was approved by both Houses and signed into law by Governor Casey on April 13, 1988. The section barring wrongful birth claims, which is at the center of this litigation, was codified at Section 8305 of the Judicial Code.[1]

Section 8305 has been consistently upheld against substantive constitutional challenges. *See, e.g., Dansby v. Thomas*

---

1. The provision states, in relevant part:

 (a) **Wrongful birth.**—There shall be no cause of action or award of damages on behalf of any person based on a claim that, but for an act or omission of the defendant, a person once conceived would not or should not have been born. . . .

 42 Pa.C.S. § 8305(a).

*Jefferson Univ. Hosp.*, 424 Pa.Super. 549, 623 A.2d 816 (1993), *appeal denied*, 539 Pa. 650, 651 A.2d 538 (1994) (*per curiam* ). The attack on its validity here arises as part of a broader argument that Act 47 is constitutionally infirm in its entirety due to a failure to comply with legislative-process requirements contained in Article III of the Pennsylvania Constitution. The context for this challenge, as noted, is a professional negligence action, as set forth below.

Rebecca Sernovitz sought medical care after becoming pregnant.[2] Because she and her husband are both of Ashkenazi Jewish heritage, their child was at increased risk of suffering from a genetic disorder known as familial dysautonomia ("F.D."). Therefore, as part of her prenatal care Mrs. Sernovitz underwent genetic testing, which showed she was a carrier of the gene mutation for F.D. Her treating physicians, however, negligently misinformed her about the test results, telling her she was not a carrier. Thereafter, Mrs. Sernovitz gave birth to a son, Samuel, who suffers from F.D. and will suffer from the disorder for the rest of his life. Mrs. Sernovitz later learned that both she and her husband are carriers of the mutation. If she had been correctly informed of the results of her test in a timely manner, further testing would have ensued, which would eventually have revealed Samuel's condition while he was still *in utero.* Had that occurred, Mrs. Sernovitz would have obtained an abortion.

In October 2010, Mr. and Mrs. Sernovitz ("Plaintiffs") filed an amended complaint against the health-care providers and their employers and corporate parents ("Defendants"), asserting claims for wrongful birth and seeking damages for medical expenses and emotional distress.[3] Although Section 8305(a) of

**2.** As this is an appeal from the sustaining of preliminary objections in the nature of a demurrer, the factual background is drawn from the amended complaint and developed in a light favorable to the plaintiffs. *See Gresik v. PA Partners, L.P.,* 613 Pa. 303, 304 n. 1, 33 A.3d 594, 595 n. 1 (2011).

**3.** The Superior Court incorrectly stated that Plaintiffs also included a claim for wrongful-life on behalf of Samuel. Such a cause of action, had it been raised, would have been precluded by subsection (b) of Section 8305. *See* 42 Pa.C.S. § 8305(b).

the Judicial Code bars such claims, *see supra* note 1, Plaintiffs alleged that Act 47 was unconstitutional in its entirety on several grounds. In particular, they averred that: the act's original purpose was changed during its passage through the General Assembly, contrary to Article III, Section 1; it contained more than one subject, in violation of Article III, Section 3; and, in its final form, it was not considered on three days in each House, thus failing to conform with Article III, Section 4. *See* PA. CONST. art. III, §§ 1, 3, 4 (stating, respectively, that "no bill shall be so altered or amended, on its passage through either House, as to change its original purpose[,]" "[n]o bill shall be passed containing more than one subject," and "[e]very bill shall be considered on three different days in each House").[4]

Defendants filed preliminary objections in the nature of a demurrer, stating that Plaintiffs' claims were precluded by Section 8305. In a supporting brief, Defendants argued that Act 47's enactment complied with Article III and, moreover, a finding of unconstitutionality more than 22 years after the act became law would have far-reaching effects relative to potentially thousands of cases that have been adjudicated since 1988. In response, Plaintiffs suggested that the court could invalidate Section 8305 and sever it from the remainder of Act 47. In this regard, Plaintiffs observed that, in *Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth*, 583 Pa. 275, 877 A.2d 383 (2005) (*"PAGE "*), this Court upheld most of the challenged enactment because virtually all of its provisions related to a single subject—regulation of the gaming industry—but severed two sections which disbursed monies from the State Gaming Fund to causes unrelated to gambling. *See id.* at 307–08, 877 A.2d at 402–03. As applied here, Plaintiffs proffered that most of Act 47 relates to a single subject, but that Section 8305 is distinct from that subject. However, Plaintiffs did not identify the single subject to which they believed most of Act 47 pertained.

**4.** Plaintiffs also alleged an Article III, Section 6 violation, but they later abandoned that claim.

The common pleas court determined that the act complied with Article III, sustained the preliminary objections on the basis that the wrongful-birth claims were barred by Section 8305, and dismissed the amended complaint. Plaintiffs appealed, repeating their substantive arguments grounded on Article III, Sections 1, 3, and 4, and reiterating their position that Section 8305 could be severed from Act 47 if necessary.

A three-judge panel of the Superior Court reversed in a published decision. *See Sernovitz v. Dershaw,* 57 A.3d 1254 (Pa.Super.2012). Focusing on the single-subject claim, the court determined that there was no unifying topic to which all aspects of Act 47 pertained. Thus, the intermediate court held that the act violated the single-subject rule. *See id.* at 1263–64. The court concluded, however, that in spite of the single-subject violation, the principal topic of the legislation was "post-trial matters in criminal cases," an area which was addressed by items such as the PCRA and the mandatory-minimum sentencing provision. *Id.* at 1266. Based on that premise, and applying a germaneness analysis, the court left those aspects of Act 47 in force while invalidating and severing four provisions that it viewed as unrelated to such purpose—including Section 8305.[5]

Having stricken Section 8305, the Superior Court reversed the common pleas court's order dismissing the amended complaint and remanded for further proceedings. *See id.*[6]

**5.** The other three sections that the Superior Court severed contained provisions: governing the appointment of substitute bail commissioners in Philadelphia, *see* 42 Pa.C.S. § 1125; limiting the defenses available for injuries sustained *in utero, see id.* § 8306; and prohibiting the dismissal of felony criminal charges at the preliminary hearing stage solely because the prosecutor or victim failed to appear, *see id.* § 8933.

**6.** For reasons that do not appear in the record or the intermediate court's opinion, the court did not evaluate whether Act 47 violated Article III, Sections 1 or 4, or whether such a violation, if found, would require invalidation of the entire act—notwithstanding that those issues were pending before the court. Moreover, the Superior Court invalidated the bill's sole original provision relating to the appointment of substitute bail commissioners in Philadelphia on the basis that it did not relate to the act's overall topic, *see supra* note 5, but it did not discuss whether this might signify that the bill violated Article III, Section 1's prohibition on a change in original purpose.

Defendants requested reconsideration or reargument *en banc*, stating, among other things, that the court should have applied the laches doctrine to avoid setting aside, on procedural grounds, a statute that had been enacted 22 years earlier and whose provisions had been relied on by hundreds, if not thousands, of litigants and potential litigants—including felony defendants whose charges were not dismissed at a preliminary hearing and individuals who elected not to assert wrongful-birth claims due to the substantive validity of Section 8305. *See generally Stilp v. Hafer*, 553 Pa. 128, 134, 718 A.2d 290, 293 (1998) ("[L]aches may apply where a challenge to a law is made on procedural grounds years after its passage."). Defendants additionally argued that, in rejecting the concept that amending Title 42 could constitute a valid single subject, the court overlooked that all of Act 47's provisions relate to the narrower topic of "civil and criminal proceedings in Pennsylvania courts."

After obtaining leave to intervene, the General Assembly also applied for reargument *en banc*.[7] The Assembly agreed with Defendants' argument that laches should have rendered Act 47 immune to procedural challenge more than 22 years after its passage. In this respect, the Assembly argued that the panel's decision had significant public implications in that the integrity and stability of Pennsylvania law could be undermined if such belated challenges were permitted—particularly where, as here, the statute had withstood substantive constitutional scrutiny. The Assembly also agreed with Defendants that Act 47's contents all related to the single subject of civil and criminal court proceedings, and it pointed out, in this regard, that the act was passed fifteen years before *City of Philadelphia v. Commonwealth*, 575 Pa. 542, 838 A.2d 566 (2003), at a time when a more lenient standard was in effect for compliance with the single-subject rule. The Assembly particularly faulted the panel for failing to acknowledge such

7. When Plaintiffs appealed to the Superior Court, they notified Pennsylvania's Attorney General of their constitutional challenge. *See* Pa. R.A.P. 521(a) (requiring such notice). However, the Attorney General elected not to participate. *See generally Sernovitz*, 57 A.3d at 1256–57 & n. 4.

chronology or evaluate whether it was proper to apply the standards articulated in *City of Philadelphia* retroactively to a 1988 enactment. Finally, the General Assembly took issue with the panel's invalidation of four of the act's provisions while leaving the remainder intact, couching such action as improperly entering the legislative domain.

The Superior Court denied reconsideration and reargument *en banc*, whereupon Defendants and the Pennsylvania Legislature (collectively, "Appellants") separately petitioned for further review in this Court. We initially held the petitions pending our resolution of *Commonwealth v. Neiman*, 74 MAP 2011, another dispute in which the Superior Court had found a single-subject violation and severed a subset of the enactment's provisions while leaving the remainder in force. *See Commonwealth v. Neiman*, 5 A.3d 353 (Pa.Super.2010) (*en banc*), *rev'd*, 624 Pa. 53, 84 A.3d 603 (2013). After reversing the Superior Court's disposition in *Neiman* on the grounds that severance was improper and the challenged legislation should have been set aside in its entirety, *see Neiman*, 624 Pa. at 74–75, 84 A.3d at 615, we granted both petitions. *See Sernovitz v. Dershaw*, 630 Pa. 404, 106 A.3d 1292 (2014) (*per curiam*).

■■■■ Our review of the common pleas court's order sustaining Defendants' preliminary objections in the nature of a demurrer is *de novo* and plenary. *See Luke v. Cataldi*, 593 Pa. 461, 468 n. 3, 932 A.2d 45, 49 n. 3 (2007). It is preferable to resolve disputes on a non-constitutional basis if reasonably possible. *See Wertz v. Chapman Twp.*, 559 Pa. 630, 633, 741 A.2d 1272, 1274 (1999). Therefore, we will first address Appellants' laches argument. "[L]aches is ... principally a question of the inequity of permitting [a] claim to be enforced[.]" *Holmberg v. Armbrecht*, 327 U.S. 392, 396, 66 S.Ct. 582, 584, 90 L.Ed. 743 (1946) (internal quotation marks omitted). As such, we initially assume, without deciding, that Act 47 violates Article III, Section 3's single-subject requirement, and evaluate whether the 22–year delay in challenging the act precludes relief.

In undertaking this assessment, we note preliminarily that the Superior Court's decision to sever portions of Act 47 cannot be sustained. The question of severance in the context of an Article III, Section 3 challenge was recently addressed in *Neiman*. That matter involved a challenge to Act 152 of 2004, which, like Act 47, effectuated multiple revisions to the Judicial Code. These included changes to Megan's Law and the imposition of new duties on certain governmental entities with regard to sexual offenders. Act 152 also encompassed provisions relating to such disparate topics as deficiency judgment procedures, the jurisdiction of county park police, and the statute of limitations for asbestos-related claims. *See Neiman*, 624 Pa. at 59–61, 84 A.3d at 606–07 (summarizing Act 152's provisions). The Superior Court found a single-subject violation, but it did not invalidate Act 152 as a whole. Instead, it interpreted *PAGE* as supporting a general precept that, when a single-subject violation is found, "extraneous" provisions of the offending bill may be severed so as to preserve its "main subject." *Neiman*, 5 A.3d at 359. Concluding that Act 152's main purpose was to regulate sexual predators, the Superior Court severed all non-Megan's Law provisions while leaving the remainder of the bill intact. *See id.* at 360.

This Court agreed that Act 152 contained more than one subject, but it disapproved the intermediate court's remedy, reasoning that, where an omnibus bill encompasses multiple disparate subjects, "all of its provisions are equally repugnant to the constitution, and, thus, equally void[.]" *Neiman*, 624 Pa. at 74, 84 A.3d at 615. While recognizing that the *PAGE* Court severed two provisions from the Gaming Act upon finding that they were not germane to the act's purpose, *Neiman* distinguished that situation as involving "minor ancillary statutory provisions." *Id.*

■ The severance issue in the present case is controlled by *Neiman*. This is not a situation like *PAGE* in which two minor, ancillary provisions of an otherwise single-subject enactment allocate funding from the regulated activity to causes unrelated to that activity. Rather, assuming Act 47 violates the single-subject rule, choosing which provisions should re-

main valid and enforceable would amount to "an untenable exercise in conjecture." *Neiman*, 624 Pa. at 73, 84 A.3d at 615. In this respect, we cannot support the Superior Court's decision to fashion the topic of "post-trial matters in criminal cases" from a subset of Act 47's sections as the single subject to which the act primarily relates. The intermediate court's action is irreconcilable with this Court's prior admonition that "it would be arbitrary to preserve one set of provisions germane to one topic, and invalidate the remainder of the bill[.]" *City of Phila.*, 575 Pa. at 586, 838 A.2d at 593, *quoted in Neiman*, 624 Pa. at 74, 84 A.3d at 615. Act 47 must stand or fall as a unit.

 Keeping this in mind, we now turn more directly to the question of laches. Under its traditional formulation, laches bars relief when there has been a delay arising from the claimant's failure to exercise due diligence in instituting an action, and such delay has resulted in prejudice to the other party. *See, e.g., In re Iulo*, 564 Pa. 205, 211, 766 A.2d 335, 338 (2001). On this topic, Appellants largely renew the arguments they advanced in their separate requests for reconsideration or reargument *en banc* as outlined above. The General Assembly also asks this Court to adopt a bright-line rule relating to procedural constitutional claims. Under the proposed rule, such a challenge may only be asserted if the complainant either (a) raises it before the end of the next full regular legislative session after the enactment's effective date, or (b) demonstrates that: (i) there was no aggrieved person who could have asserted it within that time, (ii) the complainant is the first person aggrieved or in the first class of persons aggrieved, and (iii) the complainant has raised the challenge before the end of the next full regular legislative session after becoming aggrieved. *See* Brief for General Assembly at 27–28.[8] The Assembly submits that limiting challenges in this

8. This suggested bright-line rule is based on a Missouri statute to similar effect, *see* Mo. Rev. Stat. § 516.500, which additionally contains a proviso that "[i]n no event shall an action alleging a procedural defect ... be allowed later than five years after the bill ... becomes effective." *Id.* The statute, in turn, is based on a concurring opinion from a

way would provide an aggrieved party with a two-to-four-year window to file a complaint, and would also give the Legislature an opportunity to pass timely remedial legislation if the law is invalidated.

The Assembly recognizes that Plaintiffs may not themselves be guilty of failing to act with due diligence. It asserts, however, that, in this unique context, a broader view of the diligence inquiry should be employed—particularly as there were other interested parties who could have timely challenged the act on procedural grounds, as evidenced by *Dansby* and other appellate decisions published in the early 1990s in which the plaintiffs questioned the substantive constitutional validity of the wrongful-birth prohibition within the timeframe presently suggested. The legislative body argues:

> Given the monumental public interest involved, it would be inappropriate to narrowly focus only on the diligence ... of any one particular plaintiff when evaluating whether the unreasonable delay element is satisfied. Such a myopic inquiry would leave the fate of our legislative system and fabric of our laws to mere happenstance.... This case presents a perfect example, as [Plaintiffs] may contend they did not unreasonably delay in filing their claim because they were not aggrieved by Act 47 until their child was born.

Brief for General Assembly at 24.

In response, Plaintiffs initially suggest that Defendants waived any defense based on laches by failing to raise it before the Court of Common Pleas and the Superior Court. They state that the Legislature's advancement of the defense is also effectively waived. In this latter regard, Plaintiffs argue that the Attorney General's decision not to participate before the Superior Court demonstrates that the Commonwealth has no interest in the matter, and hence, the Attorney General's waiver is binding on the General Assembly. *See* Brief for Appellees at 40.

Missouri Supreme Court decision. *See Hammerschmidt v. Boone Cnty.,* 877 S.W.2d 98, 105 (Mo.1994) (Holstein, J., concurring).

Apart from waiver, Plaintiffs indicate that laches should not pertain here because, unlike in *Stilp*, they exercised due diligence by timely bringing a claim after suffering an injury. They dispute the General Assembly's suggestion that in the present context the lack of diligence by other similarly-situated parties is material. Plaintiffs posit that such has never been part of the laches defense and the Assembly has not supplied supporting authority for its proposed broader view of the diligence inquiry. Similarly, Plaintiffs argue that Appellants have not shown that the 22–year delay caused them to change their position or otherwise suffer prejudice. Plaintiffs contend, in this respect, that Appellants are forced to rely on either the harm that would befall Pennsylvania citizens generally who benefit from stability in the laws of the Commonwealth, or the impact on the finality of hundreds of settled criminal matters (unrelated to the present case) that would allegedly arise from the invalidation of Act 47. Again, Plaintiffs indicate that these types of harms are not pertinent to a laches defense and that, in all events, they are speculative harms that have not been proven by facts of record. *See* Brief for Appellees at 46–50.

More broadly, Plaintiffs maintain that the defense raised by Appellants does not sound in laches at all. Rather, they contend, it is based on the "simple assertion [that] too much time has passed to allow a challenge to Act 47 under Article III," a principle they say this Court has never endorsed, making the present issue one of first impression. *Id.* at 51.

We agree with Plaintiffs that the argument forwarded by Appellants is not, strictly speaking, a laches defense. Laches rests, in part, on a finding that the complaining party is "guilty of want of due diligence in failing to institute his action" in a timely manner. *United Nat'l Ins. Co. v. J.H. France Refractories Co.*, 542 Pa. 432, 440, 668 A.2d 120, 124 (1995) (internal quotation marks omitted). That circumstance is not directly implicated by process challenges (such as this one) in which tort plaintiffs, who may have been minor children or not yet born at the time the legislation under review became law, institute an otherwise timely action after suffer-

ing a private injury. Moreover, laches is an affirmative defense that should ordinarily be raised in a responsive pleading under "New Matter." *See Reott v. Asia Trend, Inc.*, 618 Pa. 228, 240 n. 6, 55 A.3d 1088, 1095 n. 6 (2012) (quoting Pa.R.C.P. No. 1030(a)). *But cf. In re Marushak's Estate*, 488 Pa. 607, 610, 413 A.2d 649, 651 (1980) (suggesting that laches may be raised in preliminary objections if its "existence . . . is clear on the face of the record"). Here, the litigation never proceeded to the responsive pleading stage: it was halted due to the county court's determination that the allegations in the amended complaint were legally insufficient to make out a viable cause of action. As explained, that conclusion was based on Section 8305(a), 42 Pa.C.S., and Plaintiffs do not presently dispute that the provision, if upheld, would foreclose their cause of action.

Finally, and importantly for present purposes, in a traditional laches scenario, the plaintiff's claim is otherwise valid and the defendant bears the burden to demonstrate that enforcing the plaintiff's rights would be inequitable under the circumstances. *See Weinberg v. State Bd. of Exam'rs of Pub. Accountants*, 509 Pa. 143, 148, 501 A.2d 239, 242 (1985). Here, by contrast, Plaintiffs' cause of action is presumptively *invalid* because it is precluded by Act 47. Hence, Plaintiffs are not trying to vindicate an otherwise viable legal claim; they are attempting to overcome a bar to the viability of their lawsuit by effectuating a large-scale change to Pennsylvania law. It may be observed, in this respect, that Act 47, like all duly-enacted legislation, enjoys a "strong presumption of validity," *City of Phila.*, 575 Pa. at 564, 838 A.2d at 580, and that Plaintiffs, as challengers, bear a "heavy burden of persuasion" in relation to their allegation of unconstitutionality. *W. Mifflin Area Sch. Dist. v. Zahorchak*, 607 Pa. 153, 163, 4 A.3d 1042, 1048 (2010). Defendants, therefore, relied, not on laches, but on the statute as the basis for their demurrer; they then argued that the process challenge arose too late to be cognizable.[9]

9. In light of these distinctions, we find use of the "laches" rubric in the present context to be imprecise, and we believe it would be more

 In terms of substance, Plaintiffs are correct in proffering that Pennsylvania courts have not previously faced the precise argument advanced herein—namely, that, even apart from any fault by the challenger, the passage of many years can operate to preclude a process challenge to legislation. The *Stilp* case is distinguishable in that it dealt with a traditional laches defense raised in the defendants' Answer and New Matter and predicated on the plaintiffs' failure to exercise reasonable diligence. The holding was that laches could be raised as an affirmative defense to a constitutional process challenge. *See Stilp*, 553 Pa. at 132–34, 718 A.2d at 292–93 (reviewing Pennsylvania and extrajurisdictional authority, and concluding that "laches may apply where a challenge to a law is made on procedural grounds years after its passage").

Despite the distinction, *Stilp* provides meaningful guidance in that it establishes that belated process challenges to legislative enactments are disfavored. In concluding that laches could be asserted, *Stilp* recognized that "courts would [otherwise] revisit statutes that are constitutionally sound in substance and that have been relied upon by the citizens of this Commonwealth." *Stilp*, 553 Pa. at 134, 718 A.2d at 293. Even absent fault by the challenger, therefore, such reliance and the prejudice that would follow from belatedly overturn-

appropriate to describe Appellants' contention as a stale-process-challenge argument. Contrary to Plaintiffs' assertion, moreover, Appellants have not waived this argument. Defendants forwarded it in briefs supporting their preliminary objections. *See* R.R. 210a, 399a–410a. As the appellees before the Superior Court, they did not bear the burden of issue preservation. *See Friends of Pa. Leadership Charter Sch. v. Chester Cnty. Bd. of Assessment Appeals*, 627 Pa. 446, 452 n. 4, 101 A.3d 66, 69 n. 4 (2014). Upon becoming aggrieved by the intermediate court's decision, Defendants addressed the topic in seeking reargument in that tribunal and discretionary review in this Court, and the General Assembly advanced the position at its first opportunity when it obtained leave to intervene. Plaintiffs have not supplied any authority to support their contention that the Attorney General's decision not to participate before the Superior Court binds the General Assembly. That contention— which in any event would not apply to Defendants—appears especially suspect since the Office of the Attorney General is not part of the legislative branch and there is no rule-based requirement that the Assembly receive notice whenever a statute's constitutionality is questioned in court.

ing the statute are important considerations. As discussed more fully below, they are particularly salient in the context of the present case, where more than 20 years passed between enactment and the commencement of litigation.

Other jurisdictions faced with process challenges lodged after lengthy periods have likewise focused on the public's reliance on the enactment's validity and the harm that would ensue if the statute were set aside on procedural grounds. In resolving a procedural challenge to a set of public financing statutes that had been relied upon by the state and certain other parties, for example, the New York Court of Appeals referred to the "profound destabilizing and prejudicial effects from delay" as "decisive factors" in its analysis. *Schulz v. State*, 81 N.Y.2d 336, 599 N.Y.S.2d 469, 615 N.E.2d 953, 957 (1993). The court continued that such factors include the adverse effect invalidation would have "on the operation and maintenance of orderly government, on those with whom the State engaged in [certain] transactions, and on society in general." *Id.*

The amount of time that has passed since enactment is a material consideration because the longer an act has been part of the statutory law and relied on by the public and the government, the more disruption to society and orderly governance is likely to follow from its invalidation. Where, as here, such reliance has continued for more than 20 years, a presumption naturally arises that any process challenge is too stale to be cognizable regardless of whether the challengers exercised reasonable diligence. Other courts have reached this conclusion relative to even shorter periods. For example, addressing a single-subject challenge to a state constitutional initiative brought nine years after voter approval, the Montana Supreme Court expressed that,

> if we allowed Plaintiffs to challenge the procedure by which [the provision] was enacted nine years after the fact, what would prevent a party from filing a similar procedural challenge to some other constitutional initiative fifteen, twenty or even thirty years after that initiative's enactment? *There must be a point at which a claim asserting that*

*Montana voters failed to follow the proper procedures in enacting a constitutional initiative simply comes too late. We have reached that point.*

*Cole v. State ex rel. Brown*, 308 Mont. 265, 42 P.3d 760, 764–65 (2002) (emphasis added).[10]

As well, we notice that in the 22 years between the passage of Act 47 and Plaintiffs' amended complaint, the criminal cases handled by Pennsylvania courts pursuant to the PCRA number in the thousands. It may also be presumed that felony charges which might have been dismissed at preliminary hearings because the victim or prosecuting attorney failed to attend were not dismissed and were ultimately pursued by the Commonwealth; defenses to claims for injuries sustained while *in utero* have been foregone; and would-be plaintiffs failed to assert causes of action for wrongful birth and/or wrongful life due to Section 8305's bar to such claims. *See* 42 Pa.C.S. §§ 8933, 8306, 8305.[11] Invalidating all of these

10. *See also SMDfund, Inc. v. Fort Wayne-Allen Cnty. Airport Auth.*, 831 N.E.2d 725, 731 (Ind.2005) (describing a 17-year delay in advancing a process challenge as "unreasonable"); *Edel v. Filer Twp.*, 49 Mich.App. 210, 211 N.W.2d 547, 548–49 (1973) (finding an 18-year delay too long); *Taylor v. Schlemmer*, 353 Mo. 687, 183 S.W.2d 913, 916 (1944) (14-year delay excessive); *City of Creston v. Center Milk Prods. Co.*, 243 Iowa 611, 51 N.W.2d 463, 465 (1952) (21-year delay inordinate); *Benequit v. Borough of Monmouth Beach*, 125 N.J.L. 65, 13 A.2d 847, 849 (N.J.1940) (nine-year delay too long). *See generally Struyk v. Samuel Braen's Sons*, 17 N.J.Super. 1, 85 A.2d 279, 282–83 (1951) (William Brennan, J.) ("The ordinance has been in effect for ten years and public policy forbids an attack based upon informalities and irregularities in the procedure which led to the adoption of the ordinance, when ... property owners affected by it have conformed to its provisions, and have fixed their status accordingly." (alterations, internal quotation marks, and citation omitted)).

11. It is also possible that mandatory minimum sentences have been imposed pursuant to Section 9719 of the Judicial Code, 42 Pa.C.S. § 9719 (requiring a three-year minimum prison sentence for certain offenses committed while impersonating a law enforcement officer), albeit we observe that the Superior Court has declared Section 9719 unconstitutional on substantive grounds based on *Alleyne v. United States*, — U.S. ——, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013) (holding that, under the Sixth Amendment, any fact which increases the penalty for a crime—*e.g.*, by triggering a mandatory minimum sentence—must be found by the jury beyond a reasonable doubt). *See Commonwealth v.*

provisions retroactive to 1988 would be unduly disruptive to the orderly administration of justice in Pennsylvania. Doing so would, as the New York court stated, cause "greater harm to the public weal than the alleged constitutional transgression itself." *Schulz,* 599 N.Y.S.2d 469, 615 N.E.2d at 957; *accord* Brief for General Assembly at 29 (asserting that a failure to bar belated procedural challenges "prejudices the Commonwealth ... by destabilizing the very foundation of its laws").[12]

In light of the foregoing, we conclude that, even if Act 47 contains more than one subject, the substantially belated nature of the present challenge, arising 22 years after enactment, renders the legislation immune to attack on that basis.[13]

*Watley,* 81 A.3d 108, 117 n. 4 (Pa.Super.2013) *(en banc ), appeal denied,* 626 Pa. 684, 95 A.3d 277 (2014) *(per curiam ).*

**12.** This is not to suggest that a law which *substantively* violates the constitution may survive scrutiny based on the passage of time alone. One court has explained that

> an ordinance that is clearly a usurpation of power, inconsistent with constitutional ... provisions, or an invasion of property with no relation to the public health, safety, morals, or welfare, is void and incapable of being validated. It can be attacked at any time, regardless of previous acquiescence or the amount of time since its passage. However, defects and irregularities in the mode of enactment ... do not pertain to the nature of the ordinance itself. In our judgment, challenges to such defects may be precluded by waiver, estoppel, or laches.

*Citizens for Responsible Gov't v. Kitsap Cnty.,* 52 Wash.App. 236, 758 P.2d 1009, 1011 (1988); *accord Schaeffer v. Anne Arundel Cnty.,* 338 Md. 75, 656 A.2d 751, 753 (1995). Although *Kitsap County* made this distinction in relation to municipal ordinances, it applies equally to acts of a state legislature. *See, e.g., SMDfund,* 831 N.E.2d at 730–31.

**13.** Nothing in this opinion should be construed as undermining the viability of *timely* process challenges, which remain cognizable as reflected in decisions such as *City of Philadelphia* and *Neiman.*

Separately, we decline at this time to erect, via judicial decree, a definitive restriction along the lines suggested by the General Assembly. Although we do not foreclose the possibility of establishing such a rule in future, it would be premature to do so now because, as noted, this is the first controversy in which the issue here decided has been presented; as such, we lack sufficient information and experience to determine the appropriate contours of a bright-line preclusive rule. In this respect, we observe that "[t]he adjudicatory process is structured to cast a narrow focus on matters framed by litigants before the Court in a highly directed fashion." *Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PriceWaterhouseCoopers,*

Accordingly, we need not resolve definitively whether Act 47 violates the single-subject rule—either pursuant to the standards in effect at the time of its passage, or under the precepts set forth in *City of Philadelphia* and its progeny—or whether it would be appropriate to apply *City of Philadelphia* retroactively to legislation enacted before it was decided. Additionally, as our holding applies equally to the other two process challenges that were pending before the Superior Court, *i.e.*, those based on Sections 1 and 4 of Article III, *see supra* note 6, there is no need for further review in the intermediate court.

The order of the Superior Court is reversed and the matter is remanded for reinstatement of the common pleas court's order dismissing the amended complaint.

Justices EAKIN, BAER, TODD and STEVENS join the opinion.

*LLP*, 605 Pa. 269, 301, 989 A.2d 313, 333 (2010). Moreover, the holding of a judicial opinion is to be read against its facts. *See Maloney v. Valley Med. Facilities, Inc.*, 603 Pa. 399, 415, 984 A.2d 478, 488 (2009). Thus, as a general precept, judicial constructs impacting wide ranges of scenarios tend to develop incrementally in light of the circumstances presented in each dispute. *See generally Upjohn Co. v. United States*, 449 U.S. 383, 386, 101 S.Ct. 677, 681, 66 L.Ed.2d 584 (1981) ("[W]e sit to decide concrete cases[.]").