**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | |
|---|---|
| JASMINE WEEKS, VANESSA WILLIAMS, ARNELL HOWARD, PATRICIA SHALLICK, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | : No. 22 EAP 2019<br>:<br>: Appeal from the Order entered on<br>: August 1, 2019 in the Commonwealth<br>: Court at No. 409 MD 2019. |
| Appellants | : ARGUED: October 16, 2019 |
| v. | |
| DEPARTMENT OF HUMAN SERVICES OF THE COMMONWEALTH OF PENNSYLVANIA, | |
| Appellee | |

**_OPINION_**

**CHIEF JUSTICE SAYLOR**                         **DECIDED:  December 18, 2019**

This is a direct appeal in the context of a process-based constitutional challenge to legislation which amended certain aspects of Pennsylvania's Human Services Code. Most notably for our purposes, the enactment terminated a cash assistance program for certain low-income individuals, which was administered by Appellee, the Pennsylvania Department of Human Services ("DHS") (formerly known as the Department of Public Welfare). Appellants requested that the Commonwealth Court, sitting as trial court, issue a preliminary injunction to prevent that aspect of the law from taking effect until a final merits determination as to the constitutionality of the act as a whole could be reached. The Commonwealth Court denied the request, and this appeal followed.

At the heart of this dispute is the cash-assistance component of a DHS program known as General Assistance (hereinafter, "Cash Assistance"). Until it was terminated by the present enactment, Cash Assistance had authorized DHS to disburse up to $215 per month to individuals meeting certain eligibility criteria as outlined in Section 432(3) of the Human Services Code. *See* 63 P.S. §432(3) (predicating eligibility on factors such as receiving treatment for substance abuse, being unable to work, being a victim of domestic violence, or caring for an unrelated child).[1]

In June 2019, Act 12 of 2019 was passed by the General Assembly and signed into law by the Governor. *See* Act of June 28, 2019, P.L. 42, No. 12 ("Act 12"). Act 12 began in January 2019 as House Bill 33, Printer's No. 47. The bill in its initial form made three substantive changes to the Public Welfare Code. First, it amended Article IV's definitional section by defining "General assistance-related categorically needy medical assistance," 63 P.S. §402, to signify medical assistance for certain types of needy persons as set forth under Section 432(3). *See id.* §432(3) (listing criteria for certain types of persons to be considered "needy" for purposes of eligibility for public assistance). Second, it re-enacted Section 403.2, which had been part of Act 80 and, as such, had been invalidated by the *Washington* Court. *See supra* note 1. That provision ended Cash Assistance while clarifying that the medical assistance component of General Assistance would continue. *See id.* §403.2. Finally, it deleted

---

[1] General Assistance also has a medical-assistance component which has not been terminated and is not presently relevant. The Legislature had previously terminated Cash Assistance in 2012. *See* Act of June 30, 2012, P.L. 668, No. 80 ("Act 80"). However, that enactment was invalidated because the version of the bill which ultimately became Act 80 included provisions that were not germane to its initial provisions – which had been entirely removed during the legislative process – and the bill as thus amended was not considered on three different days in each House as required by Article III, Section 4 of the Pennsylvania Constitution. *See Washington v. Dep't of Pub. Welfare*, ___ Pa. ___, ___, 188 A.3d 1135, 1153-54 (2018).

Section 442.1(a)(3)(i), which had specified that a person was automatically considered "medically needy" if that person received Cash Assistance benefits.

H.B. 33 was sent to the House Appropriations Committee where it was amended for the first and only time. When it emerged from that committee, it was assigned Printer's No. 2181 and contained the same items as appeared in Printer's No. 47,[2] as well as several additional provisions which made further changes to the Public Welfare Code. The added sections included text which: (a) increased from $8 million to $16 million the state medical assistance funds available to certain non-public nursing facilities that provide care to low-income individuals as an incentive for such homes to accept more Medicaid patients; (b) amended definitions which apply to the Statewide Quality Care Assessment, a program which generates revenue to pay for health-care services for low-income individuals; (c) allowed assessments levied by municipalities upon hospitals to be used for Medical Assistance managed care organizations providing health care services within the municipality; (d) re-authorized and extended to June 30, 2024, an assessment program on high-volume Medicaid hospitals which is used to generate funding for low-income individuals; and (e) altered the definition of a high volume Medicaid hospital from a hospital providing over 90,000 days of care to Pennsylvania medical assistance patients to one providing over 60,000 days of inpatient acute care to such patients. The bill as thus amended was passed by both Houses of the Legislature, and it was signed by Governor Wolf on June 28, 2019.

On July 22, 2019, Appellants, being aggrieved by the termination of Cash Assistance, filed in the Commonwealth Court's original jurisdiction a Class Action Petition for Review on behalf of themselves and others similarly situated (the "Petition").

---

[2] Only one minor revision was made to the text of these initial provisions: the Cash Assistance termination date was moved from July 1 to August 1 of 2019.

In the Petition, Appellants requested class certification as well as declaratory relief in the form of a determination that Act 12 is unconstitutional under Article III, Sections 1 and 3 of the Pennsylvania Constitution. *See* PA. CONST. art. III, §§1, 3 (stating, respectively, that "no bill shall be so altered or amended, on its passage through either House, as to change its original purpose," and "[n]o bill shall be passed containing more than one subject, which shall be clearly expressed in its title, except a general appropriation bill or a bill codifying or compiling the law or a part thereof"). They also asked that the court enjoin the Department and other state officials from implementing Sections 1, 2, or 3 of the enactment – i.e., the items that appeared in Printer's No. 47 and remained substantively unchanged in the final bill.

Together with the Petition, Appellants filed an Application for Special Relief in the Nature of a Preliminary Injunction (the "Application"). In the Application, Appellants sought expedited consideration in view of the upcoming effective date of the termination of Cash Assistance, as well as a preliminary injunction to preserve the status quo – that is, to prevent Cash Assistance from being ended – pending a final determination of the merits of their constitutional challenge.

The Commonwealth Court granted expedited consideration and, on August 1, 2019 – the same day Cash Assistance was terminated – it disposed of Appellants' request for preliminary relief in a memorandum opinion and order. *See Weeks v. Dep't of Human Servs.*, No. 409 M.D. 2019, *slip op.* (Pa. Cmwlth. Aug. 1, 2019). Initially, the court noted that, to obtain a preliminary injunction, the petitioner must establish six prerequisites: (1) relief is necessary to prevent irreparable harm that cannot be adequately compensated by a monetary award; (2) greater injury will occur from the denial of the injunction than from its issuance; (3) the injunction will restore the parties to their status quo as it existed before the alleged wrongful conduct; (4) the petitioner is

likely to prevail on the merits; (5) the injunction is reasonably suited to abate the offending activity; and (6) the injunction will not adversely affect the public interest. *See id.* at 3 (citing *Summit Towne Ctr., Inc. v. Shoe Show of Rocky Mount, Inc.*, 573 Pa. 637, 645, 828 A.2d 995, 1000 (2003)). The Commonwealth Court ultimately held that Appellants failed to establish a likelihood of success on the merits or irreparable harm. *See id.* at 4, 6. As this meant that they were unable to prevail under the governing standard, the court denied the requested preliminary injunction. *See id.* at 6.[3]

Appellants appealed, and this Court noted probable jurisdiction. *See Weeks v. Dep't of Human Servs.*, No. 22 EAP 2019 (Pa. Aug. 20, 2019) (per curiam); Pa.R.A.P. 311(a)(4) (relating to appeals from orders granting or denying an injunction).

This Court exercises a highly deferential standard of review when considering a trial court's ruling on a request for a preliminary injunction. Under that standard, we review for an abuse of discretion, *see Marcellus Shale Coal. v. Dep't of Envtl. Prot.*, 646 Pa. 482, 500, 185 A.3d 985, 995 (2018), and will affirm the denial of preliminary relief if the trial court had any apparently reasonable grounds for its action. Such grounds exist when the court properly found that any one of the prerequisites was not satisfied. *See Warehime v. Warehime*, 580 Pa. 201, 209, 860 A.2d 41, 46 (2004). "Only if it is plain that no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous or misapplied will we interfere with the decree." *Marcellus Shale Coal.*, 646 Pa. at 500, 185 A.3d at 995-96 (brackets omitted) (quoting *Brayman Constr. Crop. v. PennDOT*, 608 Pa. 584, 602, 13 A.3d 925, 935-36 (2011)); *accord Shenango Valley Osteopathic Hosp. v. Dep't of Health*, 499 Pa. 39, 50, 451 A.2d 424, 439 (1982)

---

[3] The Commonwealth Court also faulted Appellants for seeking only to preliminarily enjoin a portion of the act in the context of litigation in which they claimed the entire act should be stricken. *See id.* at 4-5. In light of our ultimate disposition, we need not determine whether the court erred in this regard.

(quoting *Bell v. Thornburgh*, 491 Pa. 263, 267, 420 A.2d 443, 445 (1980)). We begin with the question of whether the Commonwealth Court appropriately held that Appellants failed to demonstrate a likelihood of success on the merits, that is, a likelihood that they would prevail on their claim that Act 12 was passed in violation of Article III, Sections 1 and 3 of the Pennsylvania Constitution.

As an initial matter, every enactment of the General Assembly is presumed valid – a presumption that extends to the manner in which it was passed, *see Commonwealth v. Neiman*, 624 Pa. 53, 67, 84 A.3d 603, 611 (2013) – and will only be stricken if the challenger demonstrates that it "clearly, palpably, and plainly violates the Constitution." *Harrisburg Sch. Dist. v. Zogby*, 574 Pa. 121, 135, 828 A.2d 1079, 1087 (2003) (quoting *Purple Orchid, Inc. v. Pa. State Police*, 572 Pa. 171, 178, 813 A.2d 801, 805 (2002)); *cf.* 1 Pa.C.S. §1922(3) (directing courts to assume the Legislature does not intend to violate the state or federal constitutions). "The party seeking to overcome the presumption of validity bears a heavy burden of persuasion." *W. Mifflin Area Sch. Dist. v. Zahorchak*, 607 Pa. 153, 163, 4 A.3d 1042, 1048 (2010).

In evaluating the Commonwealth Court's conclusion as to the validity of Act 12, it is helpful to review this Court's decisions addressing challenges based on Article III, Sections 1 and 3, in the modern era. As Section 3 has been more frequently litigated, we begin with that provision.

In *City of Philadelphia v. Commonwealth*, 575 Pa. 542, 838 A.2d 566 (2003), this Court charted something of a middle course between overly-strict and overly-lenient enforcement of Section 3, each of which had prevailed during different periods since the provision first appeared in the Constitution of 1874. The Court explained that

> exercising deference by hypothesizing reasonably broad topics . . . is appropriate to some degree, because it helps ensure that Article III does not become a license for the judiciary to "exercise a pedantic tyranny" over

the efforts of the Legislature. *In re Com., Dep't of Transp.*, 511 Pa. 620, 626, 515 A.2d 899, 902 (1986). There must be limits, however, as otherwise virtually all legislation, no matter how diverse in substance, would meet the single-subject requirement. *See Payne v. School Dist. of Borough of Coudersport*, 168 Pa. 386, 389, 31 A. 1072, 1074 (1895) (*per curiam*) (indicating that "no two subjects are so wide apart that they may not be brought into a common focus, if the point of view be carried back far enough"). In that event, Section 3 would be rendered impotent to guard against the evils that it was designed to curtail. Such vices reflect temptations which, being inherent to the law-making process, are present in every era.

*Id.* at 578, 838 A.2d at 588 (footnote omitted).

In conformance with the above, the Court observed that the bill at issue primarily amended Title 53 of the Pennsylvania Consolidated Statutes, pertaining to municipalities generally. Nevertheless, its specific provisions were substantially diverse. They changed the size and composition of the Pennsylvania Convention Authority's governing board, as well as the manner in which the Convention Center was governed; restricted the political activities of police officers; authorized parking authorities to undertake mixed-use development projects; imposed a citizenship requirement for board members of business improvement districts; transferred authority over Philadelphia's taxis and limousines from the Public Utility Commission to the Philadelphia Parking Authority; authorized municipalities to hold gifts in trust; and repealed a provision of the Pennsylvania Intergovernmental Cooperation Authority Act, which had, *inter alia*, required arbitrators involved in collective bargaining disputes to accord substantial weight to Philadelphia's financial plan and its ability to fund any relevant salary increases. Although most of the provisions may have related in some way to municipalities, that topic was extremely broad and, moreover, the Convention Center was a state, not local, entity. Thus, as there was "no single unifying subject to which all of the provisions of the act [were] germane," *id.* at 579, 838 A.2d at 589, the enactment was declared unconstitutional. *See id.* at 586, 838 A.2d at 593.

Since *City of Philadelphia*, other challenged laws have been found to violate the single-subject rule. These include legislation which: abolished the office of jury commissioner and provided for the auction and sale of surplus farm equipment, *see Pa. State Ass'n of Jury Comm'rs v. Commonwealth*, 619 Pa. 369, 381-82, 64 A.3d 611, 619 (2013) (rejecting the government's unifying subject framed as "powers of county commissioners"); established a two-year limitation period for asbestos claims, amended deficiency judgment procedures in the common pleas courts after an execution sale of real property, and made changes to Megan's Law, *see Commonwealth v. Nieman*, 624 Pa. 53, 70, 84 A.3d 603, 613 (2013) (disapproving the government's proposed unifying topics of "refining civil remedies" and "judicial remedies and sanctions"); defined a new criminal offense of theft of secondary metals (such as copper or aluminum) or cables used by utility and transportation agencies, required the state police to send the federal government certain mental-health records, and expanded the class of persons with standing to challenge local firearms regulations, *see Leach v. Commonwealth*, 636 Pa. 81, 93-94, 141 A.3d 426, 434 (2016) (disagreeing that all such provisions could reasonably be unified, for Section 3 purposes, under either the subject of "amending aspects of the Crimes Code," or the fallback topic of "Crimes Code amendments involving the regulation of firearms or the ability to own a firearm").[4]

_____

[4] *See also Sernovitz v. Dershaw*, 57 A.3d 1254, 1263-64 (Pa. Super. 2012) (invalidating a statute which "contain[ed] a veritable potpourri of legislation, ranging from magisterial district judges to financial management, from DNA testing to jurisdictional considerations"), *rev'd on other grounds*, 633 Pa. 641, 127 A.3d 783 (2015); *DeWeese v. Weaver*, 824 A.2d 364, 370 (Pa. Cmwlth. 2003) (*en banc*) (striking a bill relating to criminal DNA records and apportioning negligence liability – and rejecting as too broad the Commonwealth's proposed unifying topic of "the business of the courts"); *cf. Pa. Ass'n of Rental Dealers v. Commonwealth*, 123 Pa. Cmwlth. 533, 540, 554 A.2d 998, 1002 (1989) (deeming "the economic well being of the Commonwealth" as so broad a unifying topic as to render the germaneness test meaningless).

There have also been instances, post-*City of Philadelphia*, in which this Court has upheld legislation against an Article III, Section 3 challenge. Thus, in *Spahn v. Zoning Board of Adjustment*, 602 Pa. 83, 977 A.2d 1132 (2009), the General Assembly passed a bill making two, seemingly unrelated, amendments to the First Class City Home Rule Act. Section 1 of the bill increased the fines and penalties for city code violations. A second section was later added which altered the class of persons having standing to appeal decisions of the city's zoning hearing board by conferring standing on the city's legislative body and eliminating taxpayer standing. Although these two changes appeared, at first glance, to have little in common, the *Spahn* Court referenced the middle-course framework embodied in the above quote from *City of Philadelphia*, and it ultimately upheld the bill on the basis that both of its sections applied to the powers and limitations of Philadelphia home-rule governance, a more constrained topic than municipalities generally. *See id.* at 110-11, 977 A.2d at 1148-49.

Four years earlier, moreover, this Court assessed the constitutionality of a voluminous bill known as the Race Horse Development and Gaming Act. *See Pennsylvanians Against Gambling Expansion Fund v. Commonwealth*, 583 Pa. 275, 877 A.2d 383 (2005) ("PAGE"). Although the legislation included provisions regulating the extant horse-racing industry, it also created an entirely new slot-machine industry in Pennsylvania and, in this regard, it included diverse topics relating to: the creation of the Gaming Control Board; the issuance of gaming licenses; the installation and operation of slot machines; the creation of various classes of slot-machine casinos; the distribution of licensing fees and revenue from such casinos; the creation of a general gaming fund as well as funds pertaining to economic and tourism development, property tax relief, and treatment for compulsive gambling; administration and enforcement of its provisions; and exclusive jurisdiction in this Court to entertain disputes regarding the

issuance of licenses and constitutional challenges to the act itself. *See id.* at 289-90, 297, 877 A.2d at 391-92, 396. Notwithstanding that the bill addressed such disparate topics and that it both created a new industry and added new regulations for an existing one, this Court held that all provisions had a nexus to the single unifying subject of the regulation of gaming. *See id.* at 297, 877 A.2d at 396.

The gist of these decisions is that a bill will be held to violate the single-subject rule only if it includes topics with "unrelated subject matter," *id.* at 303, 877 A.2d at 400, where "unrelated" connotes that any attempt to tie the provisions together within a single, unifying subject necessarily involves an overly-broad topic – such as the business of the courts, municipalities, or the economic wellbeing of the Commonwealth – which would empty the germaneness test of all meaning.

In our view, the Commonwealth Court, working within this landscape, properly determined that Act 12 does not include provisions that are so far removed from each other that they are "unrelated" or would otherwise render the germaneness test meaningless. Rather, the act as a whole relates to the provision of benefits pertaining to the basic necessities of life to certain low-income individuals. Some of these benefits may be in the form of cash assistance for such items as basic utility services, food, clothing, and personal hygiene products, while others may be supplied through medical or nursing-home care, the delivery of which is incentivized by payments to providers. Regardless, such a topic is, in our view, both unifying and sufficiently narrow to fit within the single-subject rubric as that concept has been spelled out in the reported decisions of Pennsylvania appellate courts. As such, it is qualitatively different from the overly-broad proposed topics already discussed which have been judicially rejected, and more akin to the regulation of gaming or the powers and limitations of Philadelphia home-rule governance, as approved in *PAGE* and *Spahn*, respectively.

We pause at this juncture to acknowledge that DHS has not proposed a topic with the precise wording reflected above. Rather, DHS indicates that the single topic to which all provisions are germane relates to amending existing provisions of the Human Services Code providing medical and financial assistance to low income individuals who are categorically needy and/or medically needy. *See* Brief for Appellee at 12-13; *see also id.* at 20 (framing a possible single subject of "whether and to whom financial and health care assistance [is] to be provided by the Commonwealth"). We do not discount that these may also constitute alternative ways of phrasing the topic which overlap substantially with the one we have articulated. In their reply brief, however, Appellants claim DHS's argument in this regard is waived as it was not advanced before the Commonwealth Court. *See* Reply Brief for Appellants at 5-6.

Appellants' waiver contention is meritless. They overlook that litigants bear no burden at all to hypothesize topics. In the context of a single-subject challenge, the issue is whether the legislation complies with the single-subject rule, not whether the government has appropriately articulated that subject. Thus, under *City of Philadelphia* and its progeny, reviewing courts are directed, on their own, to hypothesize reasonably broad subjects as a means of exercising deference to the legislative body while testing single-subject conformance. *See City of Phila.*, 575 Pa. at 578, 838 A.2d at 588; *cf. PAGE*, 583 Pa. at 318, 877 A.2d at 409 (expressing, in the context of an Article III, Section 1 challenge, that "it is helpful *for a reviewing court* to hypothesize . . . as to a reasonably broad original purpose" (emphasis added)). A litigant's proposed topic is, therefore, merely an aid to the court in undertaking its own task. It is not a legal issue or claim for relief subject to the rule of waiver. *See* Pa.R.A.P. 302(a) (providing that "issues" are waived if raised for the first time on appeal).

For largely the same reasons, we find that the Commonwealth Court correctly concluded that no Article I, Section 1 violation had occurred. The original subject of the bill was limited to the Cash Assistance provision. In resolving a Section 1 challenge, courts ask whether the amendments ultimately made to the bill were germane to that provision's purpose. Again, every effort is made to uphold the law by hypothesizing a reasonably broad topic even for the original version of the bill, while not crediting a topic so broad as to drain the germaneness test of meaning. *See PAGE*, 583 Pa. at 318, 877 A.2d at 409. In *Washington*, this Court explained that

> it is expected that a bill will undergo some changes during the course of its passage through each House of the General Assembly. Thus, in assessing a claim that the procedure used to pass a bill violated Article III, Section 4, we have traditionally employed a "germaneness" test which affords due regard for the necessity of preserving flexibility in the legislative crafting process, while maintaining the strength of the safeguards for the regularity and transparency of this process afforded by Article III, Section 4.

*Washington*, ___ Pa. at ___, 188 A.3d at 1151. Although the *Washington* Court was considering a Section 4 challenge, the same germaneness test as expressed in that matter is used in considering whether a change of purpose under Section 1 occurred during the legislative process:

> [A] reviewing court must consider the original purpose of the legislation in reasonably broad terms, compare it to the final purpose, and then decide whether there has been an alteration or amendment that changed the original purpose.

*Stilp v. Commonwealth*, 588 Pa. 539, 603, 905 A.2d 918, 956 (2006) (quotation marks and citation omitted).

The point is that a potential unifying purpose is not judged solely according to the provision with which the bill started, but by reference to a sufficiently broad (albeit not overly-broad) purpose within which all the amendments in the final bill may also fit.

Here, as discussed, H.B. 33 originally had only three provisions, all relating in some way to Cash Assistance. The additional sections which were included in the final version of the bill all fit within the unifying topic mentioned in the above discussion pertaining to the single-subject rule. Moreover, this is not a case in which the original bill was "gutted" and its "hollow shell" was then filled with distinct provisions. *Washington*, ___ Pa. at ___, 188 A.3d at 1150; *see also id.* (referring to such a process as creating a "reanimated 'zombie' bill [addressing] facially different subjects"). Rather, as noted, the original provisions remained in the bill and were supplemented by other sections falling within the rubric of a single unifying topic.

In light of the above, we find that the Commonwealth Court did not abuse its discretion in determining that Appellants failed to carry their burden with regard to the likelihood-of-success-on-the-merits aspect of the standard for preliminary injunctive relief. That being the case, we need not address whether the court erred in finding that Appellants failed to demonstrate irreparable harm. *See generally Allegheny Cty. v. Commonwealth*, 518 Pa. 556, 560, 544 A.2d 1305, 1307 (1988) (indicating that if a petitioner fails to establish any one of the multiple prerequisites for a preliminary injunction, the others need not be addressed).

The order of the Commonwealth Court denying preliminary injunctive relief is affirmed.


Justices Baer, Todd, Donohue, Dougherty and Mundy join the opinion.

Justice Todd files a concurring opinion in which Justices Donohue and Dougherty join.

Justice Wecht files a dissenting opinion.